## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| PARKWAY BANCORP, INC.; PARKWAY | ) | |
| BANK & TRUST, CO.; ROCCO SUSPENZI; | ) | |
| JEFFREY SUSPENZI; THE SUSPENZI | ) | |
| FAMILY CORPORATION; CONNIE | ) | |
| PAYTON; MYOUNG HWA BAE; RONALD | ) | |
| BLACKSTONE; SANDRA DEGNAN; | ) | |
| MAUREEN S. FLAHERTY; ALBERT W. | ) | FILED: APRIL 16, 2008 |
| JOHNSON; ALTHEA KNOWLES; | ) | 08CV2185    AEE |
| ELIZABETH LUCAS; JOAN S. MORRISSEY; | ) | JUDGE MORAN |
| MAUREEN J. OBERMEIER; ERNEST J. | ) | MAGISTRATE JUDGE NOLAN |
| OJEDA; RUDOLPH RODRIGUEZ; | ) | |
| KATHRYN V. SHANNON; ARTHUR J. | ) | |
| SMITH, SR.; LESTER MCKEEVER, JR.; AND | ) | |
| WALTER GRADY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Federal Insurance Company ("Federal"), by and through its undersigned counsel, hereby files its Complaint for Declaratory Judgment against Defendants Parkway Bancorp, Inc. ("Parkway Bancorp"); Parkway Bank & Trust, Co. ("Parkway"); Rocco Suspenzi; Jeffrey Suspenzi; The Suspenzi Family Corporation; and nominal defendants Connie Payton; Myoung Hwa Bae; Ronald Blackstone; Sandra Degnan; Maureen S. Flaherty; Albert W. Johnson; Althea Knowles; Elizabeth Lucas; Joan S. Morissey; Maureen J. Obermeier; Ernest J. Ojeda; Rudolph Rodriguez; Kathryn V. Shannon; Arthur J. Smith, Sr.; Lester McKeever, Jr.; and Walter Grady (collectively referred to as the "Underlying Plaintiffs"). In support of its Complaint, Federal states as follows:

**Nature of the Case**

1.      Federal brings this Complaint for Declaratory Judgment seeking a declaration that the ForeFront by Chubb for Banks insurance policy that it issued to Parkway Bancorp does not provide coverage for a lawsuit filed in the Circuit Court of Cook County by the Underlying Plaintiffs against Parkway, Rocco Suspenzi, Jeffrey Suspenzi, The Suspenzi Family Corporation and others.  The underlying lawsuit alleges that the defendants, including Parkway, Rocco Suspenzi and Jeffrey Suspenzi, committed breach of contract and engaged in a conspiracy that injured the Underlying Plaintiffs who invested in Emerald Casino, Inc., an entity formed for the purpose of operating a riverboat casino in Illinois.

**Parties**

2.      Federal is a corporation organized under the laws of the State of Indiana with its principal place of business located in New Jersey.

3.      On information and belief, Parkway Bancorp is an Illinois corporation based in Harwood Heights, Illinois that operates as the parent company of Parkway.

4.      On information and belief, Parkway is an Illinois bank based in Harwood Heights, Illinois and is a subsidiary of Parkway Bancorp.

5.      On information and belief, Rocco Suspenzi resides in Cook County, Illinois.

6.      On information and belief, Jeffrey Suspenzi did at all relevant times reside in Cook County, Illinois.

7.      On information and belief, The Suspenzi Family Corporation is an Illinois corporation controlled by Rocco Suspenzi.

8.      On information and belief, Connie Payton, a plaintiff in the underlying action, resides in Cook County, Illinois.

2

9.      On information and belief, Myoung Hwa Bae, a plaintiff in the underlying action, resides in Cook County, Illinois.

10.      On information and belief, Ronald Blackstone, a plaintiff in the underlying action, resides in Cook County, Illinois.

11.      On information and belief, Sandra Degnan, a plaintiff in the underlying action, resides in Cook County, Illinois.

12.      On information and belief, Maureen S. Flaherty, a plaintiff in the underlying action, resides in Cook County, Illinois.

13.      On information and belief, Albert W. Johnson, a plaintiff in the underlying action, resides in Cook County, Illinois.

14.      On information and belief, Althea Knowles, a plaintiff in the underlying action, resides in Cook County, Illinois.

15.      On information and belief, Elizabeth Lucas, a plaintiff in the underlying action, resides in Cook County, Illinois.

16.      On information and belief, Joan S. Morrissey, a plaintiff in the underlying action, resides in DuPage County, Illinois.

17.      On information and belief, Maureen J. Obermeier, a plaintiff in the underlying action, resides in Cook County, Illinois.

18.      On information and belief, Ernest J. Ojeda, a plaintiff in the underlying action, resides in Cook County, Illinois.

19.      On information and belief, Rudolph Rodriguez, a plaintiff in the underlying action, resides in Cook County, Illinois.

20.    On information and belief, Kathryn V. Shannon, a plaintiff in the underlying action, resides in Lake County, Illinois.

21.    On information and belief, Arthur J. Smith, a plaintiff in the underlying action, resides in Cook County, Illinois.

22.    On information and belief, Rudolph Rodriguez, a plaintiff in the underlying action, resides in Cook County, Illinois.

23.    On information and belief, Lester McKeever, Jr., a plaintiff in the underlying action, resides in Cook County, Illinois.

24.    On information and belief, Walter Grady, a plaintiff in the underlying action, resides in Will County, Illinois.

### Jurisdiction and Venue

25.    The Court has subject matter jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the Plaintiff and all Defendants and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.   Federal also brings this claim for a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

### The Federal Policy

27.    Federal issued a ForeFront by Chubb for Banks insurance policy to Parkway Bancorp located in Harwood Heights, Illinois, Policy No. 7023-4702, covering the **Policy Period** April 30, 2005 to April 30, 2006 (the "Policy").   The Policy contains several Insuring Clauses, including Directors and Officers (D&O) Liability, Bankers Professional Liability (BPL), and

Lending Liability.  The Declarations page of the Policy lists Parkway Bancorp, Inc. as the **Parent Organization**.  (A true and correct copy of the Policy is attached hereto as Exhibit A.)[1]

28.     The Policy includes the following Insuring Clauses:

Directors and Officers (D&O) Liability

C.     The Company shall pay on behalf of an **Insured** all **Loss** on account of any **D&O Claim** first made against an **Insured Person** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act**.

\*     \*     \*

Bankers Professional Liability (BPL)

E.     The Company shall pay on behalf of an **Insured** all **Loss** on account of any **BPL Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** while performing **Professional Services**, including failure to perform **Professional Services**.

Lending Liability

F.     The Company shall pay on behalf of an **Insured** all **Loss** on account of any **Lending Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** while performing **Lending Services**.

29.     The "Defense and Settlement" section of the Policy provides, in part, as follows:

15.     The Company shall have the right and duty to defend any **Claim** covered by this Policy.  Coverage shall apply even if any of the allegations are groundless, false or fraudulent.  The Company's duty to defend shall cease upon exhaustion of the Company's applicable Limit of Liability set forth in the Declarations.

\*     \*     \*

**Defense Costs** are part of and not in addition to the applicable Limit of Liability set forth in the Declarations, and the payment by the Company of **Defense Costs** reduces such applicable Limit of Liability.

---

[1] Bolded terms indicate terms defined by the Policy.

30.     The "Reporting and Notice" section of Policy states in part:

27.     Any **Insured** shall, as a condition precedent to exercising their rights under this Policy, give the Company written notice as soon as practicable of any **Claim**.

If, during the **Policy Period**, an **Insured** becomes aware of circumstances which could give rise to a **Fiduciary Claim, D&O Claim** or **BPL Claim** and gives written notice of such circumstances to the Company, then any **Fiduciary Claim, D&O Claim** or **BPL Claim** subsequently arising from such circumstances, shall be considered to have been made during the **Policy Period** in which the circumstances were first reported to the Company.

All **Insured**s shall, as a condition precedent to exercising their rights under this Policy, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim** or circumstances.

31.     The "Definitions" section of the Policy, as amended by endorsement, defines the following terms in the Policy:

**BPL Claim** means:

a.     a written demand for monetary damages;

b.     a civil proceeding commenced by the service of a complaint or similar pleading;

c.     a criminal proceeding commenced by a return of an indictment; or

d.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

brought by or on behalf of a customer of the **Insured** against an **Insured** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured** solely while performing **Professional Services**.

**Claim** means any **Employment Claim, Fiduciary Claim, D&O Claim, BPL Claim**, or **Lending Claim**. A **Claim** shall be deemed to have been

6

made against the **Insureds** on the date any **Insured** first received written demand for monetary damages, the date that the judicial or administrative proceeding is served upon any **Insured** in any state, provincial or federal court or administrative agency, or the date any **Insured** first received written notice regarding the filing of a notice of charges, formal investigative order or similar document from a state, provincial or federal regulatory agency.

\*        \*        \*

**D&O Claim** means:

a.      a written demand for monetary damage;

b.      a civil proceeding commenced by the service of a complaint or similar pleading;

c.      a criminal proceeding commenced by a return of an indictment; or

d.      a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

against any **Insured Person** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured Person** solely in his or her **Insured Capacity** or by such **Insured Person** serving in any **Outside Directorship**, including any appeal therefrom.

\*        \*        \*

**Insured** means any **Insured Organization** or any **Insured Person.**

**Insured Capacity** means the position held by an **Insured Person** in any **Insured Organization** but shall not include any position in any organization other than such **Insured Organization**, even if such **Insured Organization** directed or requested such **Insured Person** to serve in such other position.

**Insured Organization** means the **Parent Organization** or any **Subsidiary**, and solely for purposes of any **Fiduciary Claim**, any **Sponsored Plan** or **Insured Plan.**

**Insured Person** means all past, present or future duly elected directors, or duly elected or appointed officers of the **Insured Organization** and as respects any **Employment Claim, Fiduciary Claim, BPL Claim,** or **Lending Claim,** employees of the **Insured Organization**.

\*       \*       \*

**Lending Claim** means:

a.      a written demand for monetary damages;

b.      a civil proceeding commenced by the service of a complaint or
         similar pleading;

c.      a criminal proceeding commenced by a return of an indictment; or

d.      a formal administrative or regulatory proceeding commenced by
         the filing of a notice of charges, formal investigative order or
         similar document,

brought by or on behalf of a customer of the **Insured** against any **Insured**
for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured**
solely while performing **Lending Services**, including any appeal
therefrom.

\*       \*       \*

**Loss** means the total amount which the **Insured** becomes legally obligated
to pay as a result of each **Claim** or for all **Claims** in each **Policy period**
and the Extended Reporting Period, if exercised, made against the
**Insureds** for **Wrongful Acts** for which coverage applies, including, but
not limited to, compensatory damages, punitive or exemplary damages
payable due to vicarious liability only, multiplied damages, judgments,
settlements, costs and **Defense Costs**.

\*       \*       \*

**Parent Organization** means the entity that is named in the Declarations,
as legally constituted at the inception date of this Policy.

\*       \*       \*

**Subsidiary** means any organization, at or prior to inception of this Policy,
in which more than 50% of the outstanding securities or voting rights
representing the present right to vote for election of directors is owned or
controlled, directly or indirectly, in any combination, by one or more
**Insured Organizations**.

\*       \*       \*

**Wrongful Act** means any error, misstatement, misleading statement, act,
omission, neglect, or breach of duty committed, attempted or allegedly
committed or attempted, before or during the **Policy Period** by any
**Insured**.

**The Underlying Action**

32.     On October 23, 2007, the Underlying Plaintiffs filed a Complaint in the Circuit Court of Cook County Illinois, captioned *Connie Payton, et al. v. Donald F. Flynn, Kevin F. Flynn, John P. McMahon, Joseph P. McQuaid, Kevin D. Larson, Walter P. Hanley, Parkway Bank & Trust Co., Rocco Suspenzi, Jeffrey Suspenzi, The Suspenzi Family Corporation, Nick Boscarino, Sherri Boscarino, The Sherri Boscarino Trust, Ida Hansen, Joseph Salamone, and Vito Salamone*, Case No. 07L11989 (the "Complaint" in the "State Action").  As described by the Complaint, the plaintiffs in the State Action were individual investors that entrusted money to Emerald Casino, Inc., a now bankrupt closely-held corporation formed for the purpose of operating a casino in Illinois.  (A true and correct copy of the Complaint filed in the State Action is attached hereto as Exhibit B.)

33.     According to the Complaint:

> 2.     The defendants named in this Complaint are both persons who controlled the operations of Emerald ("Insider Defendants") and others (the "Secret Investor Defendants") who, often through undisclosed investments in Emerald, facilitated or sought to facilitate the infiltration of Emerald's operations by organized crime ("Secret Investor Defendants"), and all of whom violated Illinois law, resulting in the revocation of Emerald's license and the loss of plaintiffs' money.

34.     Among the "Secret Investor Defendants," the Complaint lists Parkway Bank & Trust Co., Rocco Suspenzi, Jeffrey Suspenzi, and The Suspenzi Family Corporation.  The Complaint further alleges:

> 13.     Parkway Bank & Trust Co. ("Parkway Bank") is an Illinois bank based in Harwood Heights, Illinois.  Parkway Bank is controlled by defendants Rocco and Jeffrey Suspenzi, and it funded defendant Nick Boscarino's secret acquisition of an ownership interest in Emerald. Parkway Bank principals, Rocco Suspenzi and Jeffrey Suspenzi, and the Suspenzi Family Corporation also secretly shared in an ownership interest in Emerald with Vito Salamone who, according to FBI memoranda, had

connections to organized crime. These secret investment interests were concealed by defendants from the IGB and from the plaintiffs.

14.    Rocco Suspenzi is Chairman of Parkway Bank. On information and belief, he resides in Cook County, Illinois.

15.    The Suspenzi Family Corporation is, on information and belief, a financial or business entity owned or controlled by Rocco and Jeffrey Suspenzi.

16.    Jeffrey Suspenzi is the son of Rocco Suspenzi and was an Assistant Vice President of Parkway Bank. In October 2006, Jeffrey Suspenzi pleaded guilty to federal charges of bank fraud and tax evasion with regard to his fraudulent misappropriation of funds from a Parkway Bank customer.

35.    The Complaint contains seven causes of action, including ones for Breach of Contract, Equitable Estoppel and Conspiracy against all defendants. In support of the Breach of Contract count, the Underlying Plaintiffs allege that "[e]ach of the plaintiffs and each of the defendants was party to, or subject to, a common shareholder agreement" that the defendants breached. In support of the Equitable Estoppel count, the Underlying Plaintiffs allege that "defendants assisted or participated in conduct upon which defendants expected plaintiffs to rely and upon which plaintiffs did justifiably rely, suffering a loss as a result, under circumstances where the duty of honest dealing and equitable principles should deny defendants the right to repudiate the consequences of their conduct."

36.    The Complaint's Conspiracy count sets forth the following allegations regarding the acts allegedly committed by Parkway and the Suspenzi defendants:

60.    Each of the defendants agreed or reached an understanding to participate in a scheme to defraud the IGB and plaintiffs. Each of the defendants understood the general objectives of the conspiratorial scheme, accepted them and agreed, explicitly or implicitly, to do his, her or its part to further those objectives, by accomplishing unlawful purposes by lawful means and/or lawful purposes by unlawful means.

61.    At the time of plaintiffs' investment, the defendants concealed from plaintiffs that secret deals that would not be disclosed to the IGB had been cut to transfer Emerald shares, including that an agreement had been made to reserve 5% of Emerald's shares for then Rosemont Mayor Stephens, who had already met with Kevin Flynn two or three times to discuss relocating the Emerald casino to Rosemont and with members of organized crime for a discussion concerning mob infiltration and control of the operations of, and various construction contracts for, a Rosemont casino.

62.    Between September 1, 1999 and September 17, 1999, Donald Flynn executed agreements to transfer almost 5% of Emerald's shares to outside investors.  Nick Boscarino and Vito Salamone both obtained interests in Emerald as a result of the 5% interest promised by the Insider Defendants to Stephens.  Through agreements and transactions with Nick Boscarino and/or Vito Salamone, defendants Sherry Boscarino, The Sherri Boscarino Trust, Ida Hansen, and Jeffrey and Rocco Suspenzi also obtained interests in Emerald Casino.

63.    Pursuant to a memorandum agreement executed in September 1999, and withheld from the IGB and plaintiffs but obtained by the FBI, the shares Donald Flynn transferred to the Salamones were, in turn, divided among the Salamones, defendant Rocco Suspenzi, defendant Jeffrey Suspenzi, and defendant Suspenzi Family Corporation.

64.    On August 30, 1999, Parkway Bank, of which defendant Rocco Suspenzi is the Chairman and Chief Executive Officer, prepared a cashier's check payable to Nick Boscarino in the amount of $1,500,000, purportedly as a loan.  The same day, August 30, 1999, Nick Boscarino endorsed that $1,500,000 cashier's check and deposited it into the account of the just-created defendant Sherri Boscarino Trust.  Also on August 30, 1999, a Parkway Bank counter check payable in the amount of $1,500,000 to Emerald Casino, Inc. was written by defendant Ida L. Hansen on the Sherri Boscarino Trust Account to purchase 1% of the outstanding shares of Emerald's capital stock.  Also on August 30, 1999, Ida Hansen signed a promissory note payable to Nick Boscarino for $1,500,000, which was not provided to the IGB at any time during its investigation of Emerald's license renewal application.

65.    During IGB proceedings, when questioned about their dealings with Emerald and Mayor Stephens, Nick and Sherry Boscarino, Ida Hansen, Vito and Joseph Salamone and Jeffrey and Rocco Suspenzi each invoked the Fifth Amendment and refused to answer.

37.    As noted in the Complaint, the State Action was preceded by an earlier action filed by essentially the same plaintiffs against the same defendants in the federal district court for the Northern District of Illinois (the "Federal Action"). The plaintiffs filed their original Complaint in the Federal Action on January 25, 2006. The plaintiffs amended their Complaint on three occasions with the Third Amended Complaint being filed on March 1, 2006.

38.    The Third Amended Complaint in the Federal Action, like its predecessors, named Parkway, Rocco Suspenzi, Jeffrey Suspenzi and The Suspenzi Family Corporation as defendants. Identifying Parkway and the Suspenzi defendants as among "The Investor Defendants," the Third Amended Complaint alleged:

> 33.    Defendant Parkway Bank & Trust Co. ("Parkway") is an Illinois bank based in Harwood Heights, Illinois. The bank served as a lender for Rosemont Mayor Donald E. Stephens ("Mayor Stephens") in many transactions and knowingly facilitated the apparent infiltration of Emerald by elements of organized crime, including by serving as a purported lender for the Boscarino defendants for the purchase of shares in Emerald. Officers of Parkway Bank & Trust also shared in the ownership interest in Emerald purchased in the name of defendant Joseph and/or Vito Salamone. Parkway Bank & Trust's Chairman and Chief Executive Officer, defendant Rocco Suspenzi, invoked the Fifth Amendment to refuse to answer questions regarding his investment, Parkway and Emerald in the IGB license revocation proceedings.

39.    The Third Amended Complaint in the Federal Action included counts alleging violations of the federal RICO statute. On October 26, 2006, the district court granted the defendants' motions to dismiss the plaintiffs' RICO counts and declined to exercise supplemental jurisdiction over the plaintiffs' state law claims.

### Federal's Investigation And Coverage Correspondence

40.    By letter dated February 14, 2006, Parkway provided Federal with notice of the then operative Second Amended Complaint filed on February 2, 2006 in the Federal Action.

41.     By letter dated February 27, 2006, Federal informed Parkway that the Policy did not afford coverage for the Federal Action and further advised Parkway to submit "any information that you might have or may obtain in the future that you believe may bear upon the question of insurance coverage for this matter."

42.     By letter dated March 23, 2006, Parkway's counsel responded to Federal's February 27, 2006 letter and asserted that the Policy afforded coverage for the Federal Action under the Director and Officers Liability, the Bankers Professional Liability, and the Lending Liability Insuring Clauses.  Federal subsequently advised Parkway that Federal maintained its position regarding the lack of coverage under the Policy in connection with the Federal Action.

43.     By letter dated November 8, 2007, Parkway provided Federal with a copy of the Complaint filed in the State Action. Referencing the earlier "federal court complaints" and its correspondence to Federal, Parkway's letter stated "this complaint is a continuation of a claim made during the policy period previously submitted" to Federal.

44.     By letter dated April 14, 2008, Federal advised Parkway that Federal agreed to provide certain Defendants with a defense, through independent counsel selected by those Defendants, subject to a complete reservation of Federal's rights under the Policy, including the right to pursue a declaratory judgment action to determine what obligations, if any, Federal owes under the Policy.

45.     An actual controversy exists between Plaintiff and Defendants concerning whether the Policy provides coverage for the State Action.

## COUNT I
### (Declaratory Judgment-Directors and Officers Liability Insuring Clause)

46.     Federal incorporates by reference Paragraphs 1 through 45 above as if fully set forth herein.

47.    The Directors and Officers Liability Insuring Clause provides as follows:

Directors and Officers (D&O) Liability

C.    The Company shall pay on behalf of an **Insured** all **Loss** on account of any **D&O Claim** first made against an **Insured Person** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act**.

48.    The Policy defines "**D&O Claim**" as follows:

**D&O Claim** means:

a.    a written demand for monetary damage;

b.    a civil proceeding commenced by the service of a complaint or similar pleading;

c.    a criminal proceeding commenced by a return of an indictment; or

d.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

against any **Insured Person** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured Person** solely in his or her **Insured Capacity** or by such **Insured Person** serving in any **Outside Directorship**, including any appeal therefrom.

49.    The Policy defines "**Insured Capacity**" as follows:

**Insured Capacity** means the position held by an **Insured Person** in any **Insured Organization** but shall not include any position in any organization other than such **Insured Organization**, even if such **Insured Organization** directed or requested such **Insured Person** to serve in such other position.

50.    Based on the above, the allegations in the Complaint do not meet the terms of the Policy's Directors and Officers Liability Insuring Clause.

WHEREFORE, Plaintiff Federal Insurance Company respectfully requests that this Court enter a judgment declaring that Federal has no duty under the Policy to defend or indemnify

Defendants Parkway, Rocco Suspenzi or Jeffrey Suspenzi with respect to the State Action, and requests such additional and further relief as the Court may deem just or proper.

## COUNT II
### (Declaratory Judgment-Bankers Professional Liability Insuring Clause)

51.     Federal incorporates by reference Paragraphs 1 through 45 above as if fully set forth herein.

52.     The Bankers Professional Liability Insuring Clause provides as follows:

Bankers Professional Liability (BPL)

E.     The Company shall pay on behalf of an **Insured** all **Loss** on account of any **BPL Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** while performing **Professional Services**, including failure to perform **Professional Services**.

53.     The Policy defines "**BPL Claim**" as follows:

**BPL Claim** means:

a.     a written demand for monetary damages;

b.     a civil proceeding commenced by the service of a complaint or similar pleading;

c.     a criminal proceeding commenced by a return of an indictment; or

d.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

brought by or on behalf of a customer of the **Insured** against an **Insured** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured** solely while performing **Professional Services**.

54.     Based on the above, the allegations in the Complaint do not meet the terms of the Policy's Bankers Professional Liability Insuring Clause.

WHEREFORE, Plaintiff Federal Insurance Company respectfully requests that this Court enter a judgment declaring that Federal has no duty under the Policy to defend or indemnify

Defendants Parkway, Rocco Suspenzi or Jeffrey Suspenzi with respect to the State Action, and

requests such additional and further relief as the Court may deem just or proper.

**COUNT III**
**(Declaratory Judgment-Lending Liability Insuring Clause)**

55.     Federal incorporates by reference Paragraphs 1 through 45 above as if fully set

forth herein.

56.     The Lending Liability Insuring Clause provides as follows:

Lending Liability

F.      The Company shall pay on behalf of an **Insured** all **Loss** on
account of any **Lending Claim** first made against such **Insured**
during the **Policy Period** or, if exercised, during the Extended
Reporting Period, for a **Wrongful Act** while performing **Lending
Services**.

57.     The Policy defines "**Lending Claim**" as follows:

**Lending Claim** means:

a.      a written demand for monetary damage;

b.      a civil proceeding commenced by the service of a complaint or
similar pleading;

c.      a criminal proceeding commenced by a return of an indictment; or

d.      a formal administrative or regulatory proceeding commenced by
the filing of a notice of charges, formal investigative order or
similar document,

brought by or on behalf of a customer of the **Insured** against any **Insured**
for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured**
solely while performing **Lending Services**, including any appeal
therefrom.

58.     Based on the above, the allegations in the Complaint do not meet the terms of the

Policy's Lending Liability Insuring Clause.

WHEREFORE, Plaintiff Federal Insurance Company respectfully requests that this Court enter a judgment declaring that Federal has no duty under the Policy to defend or indemnify Defendants Parkway, Rocco Suspenzi or Jeffrey Suspenzi with respect to the State Action, and requests such additional and further relief as the Court may deem just or proper.

## COUNT IV
### (Declaratory Judgment- The Suspenzi Family Corporation)

59.     Federal incorporates by reference Paragraphs 1 through 45 above as if fully set forth herein.

60.     The Policy defines an **Insured** as follows:

**Insured** means any **Insured Organization** or any **Insured Person.**

61.     The Policy defines an **Insured Organization** as follows:

**Insured Organization** means the **Parent Organization** or any **Subsidiary**, and solely for purposes of any **Fiduciary Claim**, any **Sponsored Plan** or **Insured Plan.**

62.     The Policy defines a **Subsidiary** as follows:

**Subsidiary** means any organization, at or prior to inception of this Policy, in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more **Insured Organizations**.

63.     The Suspenzi Family Corporation is not an **Insured** as defined by the Policy.

WHEREFORE, Plaintiff Federal Insurance Company respectfully requests that this Court enter a judgment declaring that Federal has no duty under the Policy to defend or indemnify Defendant The Suspenzi Family Corporation with respect to the State Action, and requests such additional and further relief as the Court may deem just or proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.


April 16, 2008                                 Respectfully submitted,

                                         **FEDERAL INSURANCE COMPANY**


                                         By:    /s/ James H. Kallianis, Jr.
                                                   One of its Attorneys


James H. Kallianis, Jr.
Seth E. Darmstadter
Meckler Bulger & Tilson LLP
123 North Wacker Drive
Suite 1800
Chicago, Illinois  60606
Telephone:    (312) 474-7900
Facsimile:     (312) 474-7898

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Federal Insurance Company is a wholly-owned subsidiary of The Chubb Corporation, a publicly-held corporation.

Dated:  April 16, 2008                    **FEDERAL INSURANCE COMPANY**


                                          By:   /s/ James H. Kallianis, Jr.
                                               One of Its Attorneys


James H. Kallianis, Jr.
Seth E. Darmstadter
Meckler Bulger & Tilson LLP
123 North Wacker Drive
Suite 1800
Chicago, Illinois  60606
Telephone:    (312) 474-7900
Facsimile:    (312) 474-7898



n:\shared\KallianisJ\Parkway.Complaint.doc

08CV2185  AEE
JUDGE MORAN
MAGISTRATE JUDGE NOLAN

# EXHIBIT A

PREMIUM BILL

Insured:   PARKWAY BANCORP, INC.                    Date:   05/18/2005

Producer:   ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES,
            INC.
            125 S. WACKER DR. #500
            CHICAGO, IL 606060000

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

NOTE: PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE
RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE. PLEASE REFER TO 7023-4702

| EFFECTIVE DATE | POLICY OR CERTIFICATE NUMBER | COVERAGE | | PREMIUM |
|---|---|---|---|---|
| April 30, 2005 | 7023-4702 | FIFFTBNK | | $111,625.00 |
| to | | | | |
| April 30, 2006 | | | | |
| | | | | |
| | | | TOTAL | $111,625.00 |
| | | | | |

Form 26-10-0426 (Ed. 2/98)

**Chubb & Son,** div. of Federal Insurance Company
as manager of the member insurers of the
Chubb Group of Insurance Companies

# POLICYHOLDER
# DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
### (for policies with no terrorism exclusion or sublimit)

You are hereby notified that, under the Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, this policy makes available to you insurance for losses arising out of certain acts of international terrorism.  Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act.  Under this formula, the United States pays 90% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.  The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ **-0-.**

If you have any questions about this notice, please contact your agent or broker.

10-02-1281 (Ed. 1/2003)

# Notice of Loss Control Services

As a Chubb policyholder, we'd like to let you know that we have valuable loss prevention information available to you. Below is a description of these services.

## Employment Practices Liability (EPL) Loss Prevention Services

* **Chubb EPL Loss Prevention Web Site**
  For information about the program, as well as a way to access many of our available services, go to http://csi.chubb.com/epllossprevention.

* **ChubbWorks.com**
  ChubbWorks.com is a web-based platform that offers multiple services including overviews of employment laws, sample employment policies and procedures, and on-line training. To gain immediate access to ChubbWorks go to **www.chubbworks.com** and register using your policy number.

* ***Employment Practices Loss Prevention Guidelines* Manual**
  Written by Seyfarth Shaw exclusively for Chubb, this manual provides an overview of key employment issues and offers proactive ideas for avoiding employment lawsuits. To order the *Employment Practices Loss Prevention Guidelines,* simply call **1.866.282.9001,** order 14-01-0061, and provide your mailing address.

* ***CheckPoint* Newsletter**
  *CheckPoint*, Chubb's periodic newsletter on employment issues will be mailed directly to you as it is published.

* **Loss Prevention Consultant Services**
  Chubb has developed a network of more than 120 law firms, human resources consulting firms, and labor economist/statistical firms that offer specialized services for employment issues. In addition to preferred rates for customers, Chubb will reimburse customers for 50% of the cost of the qualified services, up to 10% of the customer's EPL insurance premium. To access the network of consultants and learn more about the consultant services program, go to Chubb's EPL Loss Prevention Web site at http://csi.chubb.com/epllossprevention.

* **Toll-free Hot Line**
  Have a question on how to handle an employment situation? Simply call **1.888.249.8425** to access the nationally known employment law firm of Jackson Lewis Schnitzler & Krupman. We offer customers an unlimited number of calls to the hot line at no additional charge.

If you have any questions on the EPL Loss Prevention program, simply consult http://csi.chubb.com/epllossprevention or email csi-info@chubb.com.

--------------------

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice.

**ILLINOIS POLICY INFORMATION NOTICE**

Section 143c of the Illinois Insurance Code requires that we notify you of the addresses of our company's complaint department and the Illinois Insurance Department Customer Service Section.

Chubb Group of Insurance Companies
Attn:  Customer Complaint Coordinator
15 Mountain View Road
P.O. Box 1615
Warren, NJ  07061-1615

Illinois Division of Insurance
Customer Service Section
320 West Washington Street
4th Floor
Springfield, IL  62767

Please include in any correspondence your policy number, policy period, and the name and address of your agent or broker. Thank you.

**Notice to Purchasers of Employment Practices Liability Coverage and/or Fiduciary Liability Coverage**

As a purchaser of Employment Practices Liability Coverage and/or Fiduciary Liability Coverage, please note that the Company has the right and duty to defend any Employment Claim and any Fiduciary Claim (as such terms are defined in the Definitions section of this Policy) covered by this Policy, unless this Policy has been amended by written endorsement.  Defense counsel for any such Employment Claim or Fiduciary Claim shall be selected by the Company from the Company's list of approved defense firms. Please also note that, as a condition precedent to any right to coverage under this Policy, all Claims must be reported to the Company in writing in the manner and within the time provided in the Reporting and Notice provisions of this Policy.

For a list of approved defense firms, please contact your insurance agent or broker, or access such list by using the following internet address:

        http://csi.chubb.com/panel_counsel.asp

Please note that the Company reserves the right to modify such list at any time without notice.

**Chubb Group of Insurance Companies**

15 Mountain View Road, Warren, New Jersey 07059

**DECLARATIONS**
**FOREFRONT BY CHUBB**
**FOR BANKS**

ITEM 1.    **Parent Organization** (Name and Address):

PARKWAY BANCORP, INC.
4800 N. HARLEM AVENUE
HARWOOD HEIGHTS, IL 60656

Policy Number: 7023-4702

**FEDERAL INSURANCE COMPANY**
Incorporated under the laws of Indiana, a stock
insurance company, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

---

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ CAREFULLY.**

ITEM 2.    Limits of Liability:

| | | |
|---|---|---|
| i. | Each **Loss** Limit of Liability | $ 10,000,000.00 |
| ii. | Aggregate Limit of Liability Each **Policy Period** | $ 10,000,000.00 |

**NOTE: THE LIMITS OF LIABILITY AND ANY DEDUCTIBLE AMOUNT ARE REDUCED OR EXHAUSTED BY DEFENSE COSTS.**

ITEM 3.    Optional Coverages:

| | | |
|---|---|---|
| i. | Insuring Clause E. Bankers Professional Liability | [X] Yes   [ ] No |
| ii. | Insuring Clause F. Lending Liability | [X] Yes   [ ] No |

**If "No" is indicated in i. or ii. above, or if neither "Yes" or "No" is indicated, it is agreed the respective Insuring Clause is deleted from this Policy, and there is no coverage under this Policy with respect to such Insuring Clause.**

| Insuring Clauses: | ITEM 4. Deductible Amount: | ITEM 5. Pending or Prior Date: |
|---|---|---|
| A. Employment Liability | $ 100,000 | 04/30/1998 |
| B. Fiduciary Liability | $ 50,000 | 01/22/1964 |
| C. Directors and Officers Liability | $ 100,000 | 11/11/1988 |
| D. Outside Directorship Liability | $ 100,000 | 11/11/1988 |
| E. Bankers Professional Liability | $ 250,000 | 04/30/1995 |
| F. Lending Liability | $ 250,000 | 04/30/1995 |

ITEM 6.    **Policy Period:**    from:  12:01 a.m. on April 30, 2005
                                              to:  12:01 a.m. on April 30, 2006
                                        Local time at the address shown in ITEM 1.

ITEM 7.    Endorsement(s) Effective at Inception:

    1-8

---

**IN WITNESS WHEREOF, THE COMPANY** issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

Secretary

President

05/18/05
Date

Authorized Representative

In consideration of payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the Company agrees as follows:

*Insuring Clauses*   1.

*Employment Liability*   A.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **Employment Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act**.

*Fiduciary Liability*   B.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **Fiduciary Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act**.

*Directors and Officers (D&O) Liability*   C.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **D&O Claim** first made against an **Insured Person** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act**.

*Outside Directorship Liability (ODL)*   D.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **D&O Claim** first made against an **Insured Person** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** by reason of such **Insured Person** serving in an **Outside Directorship**.

*Bankers Professional Liability (BPL)*   E.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **BPL Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** while performing **Professional Services**, including failure to perform **Professional Services**.

*Lending Liability*   F.   The Company shall pay on behalf of an **Insured** all **Loss** on account of any **Lending Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** while performing **Lending Services**.

*Spousal Liability Extension*   2.   If a **Claim** against an **Insured Person** includes a claim against the **Insured Person's** lawful spouse solely by reason of such person's status as a spouse or such spouse's ownership interest in property which the claimant seeks as recovery for a **Wrongful Act** of such **Insured Person**, all loss which the spouse becomes legally obligated to pay on account of such **Claim** shall be treated as **Loss** which the **Insured Person** becomes legally obligated to pay on account of the **Claim** made against such **Insured Person**. All limitations, conditions, provisions and other terms of coverage applicable to the **Insured Person's Loss** shall also be applicable to the spousal loss. However, coverage shall not apply to the extent any claim alleges any **Wrongful Act** by the **Insured Person's** spouse.

| Estates and Legal Representatives | 3. | Subject to the limitations, conditions, provisions and other terms of this Policy, coverage shall extend to **Claims** for **Wrongful Acts** of an **Insured** made against the estates, heirs, legal representatives or assigns of **Insured Persons** who are deceased, incompetent, insolvent or bankrupt. |
|---|---|---|

| Extended Reporting Period | 4. | If this Policy is terminated or non-renewed for any reason, other than nonpayment of premium, then the **Parent Organization**, on behalf of the **Insureds**, shall have the right, upon payment of additional premium of 75% of the annual Policy premium, to an extension of the coverage granted by this Policy for twelve (12) calendar months following the effective date of termination or non-renewal, but only for a **Wrongful Act** occurring prior to the effective date of termination or non-renewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days following the effective date of termination or non-renewal. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**. The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew. |
|---|---|---|
|  |  | If the Extended Reporting Period is purchased, the entire additional premium shall be deemed fully earned at the inception of such Extended Reporting Period. |

| Exclusions Applicable to any Claim | 5. | The Company shall not be liable for **Loss** on account of any **Claim**: |
|---|---|---|
|  | a. | based upon, arising from, or in consequence of any circumstance if written notice of such circumstance has been given under any policy for which this Policy is a renewal or replacement, and if such prior policy affords coverage (or would afford coverage except for the exhaustion of its limits of liability) for such **Loss**, in whole or in part, as a result of such notice; |
|  | b. | based upon, arising from, or in consequence of: |
|  | i. | the actual, alleged or threatened discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or |
|  | ii. | any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so, |
|  |  | including but not limited to any **Claim** for financial loss to any **Insured Organization**, its security holders or its creditors based upon, arising from, or in consequence of the matters above. However, this Exclusion shall not apply to any **Employment Claim** for wrongful dismissal, discharge or termination of employment of any claimant in retaliation for such claimant's actual or alleged refusal to violate any federal, state or local statutory law or common law, or such claimant's actual or alleged disclosure regarding any matters described in i. or ii. above; |
|  | c. | based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered for or against any **Insured** on or prior to the Pending or Prior Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein; |

**Exclusions Applicable to any Claim** (continued)

d. for bodily injury, mental or emotional distress (except emotional distress or mental anguish solely as respects any **Employment Claim**), sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof;

e. based upon, arising from, or in consequence of any deliberately fraudulent act or omission if a judgment or other final adjudication adverse to an **Insured** or to any person for whose actions an **Insured** is legally liable, establishes such deliberately fraudulent act or omission.

---

**Exclusions Applicable to any Employment Claim**

6. The Company shall not be liable for **Loss** on account of any **Employment Claim**:

a. based upon, arising from, or in consequence of any actual or alleged obligation of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or similar law. However, this Exclusion shall not apply to any **Employment Claim** for retaliatory treatment of a claimant by an **Insured** on account of the claimant's exercise of rights pursuant to any such law;

b. based upon, arising from or in consequence of:

    i. any actual or alleged violation of any federal, state, local or common law relating to securities, or any rules or regulations promulgated thereunder, all as amended; or

    ii. any actual or alleged purchase, sale or distribution of or offer, representation or agreement relating to securities.

    However, this Exclusion shall not apply to any **Employment Claim** for any retaliatory treatment of any claimant for such claimant's actual or alleged refusal to violate any such securities laws, or any actual or threatened disclosure by such claimant of any actual or alleged violation of such securities laws;

c. for liability of others assumed by any **Insured** under any contract or agreement, either oral or written, except to the extent that an **Insured** would have been liable in the absence of the contract or agreement; or

d. for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act or any amendments to or rules or regulations promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory law or common law. However, this Exclusion shall not apply to any **Employment Claim** for any retaliatory treatment of any claimant with respect to actual or threatened disclosures by such claimant of any actual or alleged violation of the Fair Labor Standards Act or the Occupational Safety and Health Act by any **Insured**.

7. The Company shall not be liable under an **Employment Claim** for that part of **Loss** other than **Defense Costs**:

a. which constitutes **Benefits** due or to become due. However, this Exclusion shall not apply where such **Loss** is based on any **Employment Claim** for actual or alleged wrongful dismissal, discharge or termination of employment;

| | | |
|---|---|---|
| *Exclusions Applicable to any Employment Claim* (continued) | b. | which constitutes front pay, future damages or other future economic relief or the equivalent thereof, if the **Insured Organization** is ordered, pursuant to a judgment or other final adjudication, but fails to reinstate the claimant as an employee; |
| | c. | which constitutes any costs associated with any accommodation required pursuant to the Americans with Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state, local statutory law or common law; or |
| | d. | which constitutes the cost of compliance with any order for, grant of or agreement to provide injunctive or non-pecuniary relief. |

*Exclusions Applicable to any Fiduciary Claim*

8. The Company shall not be liable for **Loss** on account of any **Fiduciary Claim**:

   a. based upon, arising from, or in consequence of liability of others assumed by any **Insured** under any contract or agreement, either oral or written, except to the extent that an **Insured** would have been liable in the absence of the contract or agreement, or the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Sponsored Plan** or **Insured Plan** was established;

   b. based upon, arising from, or in consequence of any actual or alleged obligation of any **Insured** pursuant to any workers compensation, unemployment insurance, social security or disability benefits or any similar law, except the Consolidated Omnibus Budget Reconciliation Act of 1985 and amendments thereto;

   c. based upon, arising from, or in consequence of an **Insured** having gained in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

   d. based upon, arising from, or in consequence of any willful violation of any statute or regulation by an **Insured**, if a judgment or other final adjudication adverse to such **Insured** establishes such willful violation; or

   e. for libel or slander.

9. The Company shall not be liable under a **Fiduciary Claim** for that part of **Loss** other than **Defense Costs**:

   a. which constitutes fines or penalties or the multiple portion of any multiplied damage award, other than the five percent or less, or the twenty percent or less, civil penalties imposed upon an **Insured** as a fiduciary under Sections 502(i) or (l), respectively, of the Employee Retirement Income Security Act of 1974 as amended;

   b. based upon, arising from, or in consequence of the failure to collect an employer's contributions owed to a **Sponsored Plan** or **Insured Plan** unless the failure is because of the negligence of any **Insured**;

   c. which constitutes the return or reversion to an employer of any contribution or asset of a **Sponsored Plan** or **Insured Plan**; or

   d. which constitutes benefits due or to become due under the terms of a **Sponsored Plan** or **Insured Plan**, except to the extent that an **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation, and recovery for the benefits is based upon a covered **Wrongful Act**.

*Exclusions Applicable to any D&O Claim*

10. The Company shall not be liable for **Loss** on account of any **D&O Claim**:

    a. brought or maintained by or on behalf of any **Insured** except:

        i. a **D&O Claim** that is a derivative action brought or maintained on behalf of an **Insured Organization** by one or more persons who are not **Insured Persons** and who bring and maintain such **D&O Claim** without the solicitation, assistance or participation of any **Insured**; or

        ii. a **D&O Claim** brought or maintained by an **Insured Person** for contribution or indemnity, if such **D&O Claim** directly results from another **Claim** covered under this Policy;

    b. based upon, arising from, or in consequence of an actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, as amended, or similar provisions of any federal, state, or local statutory law or common law as respects any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of an **Insured Organization**;

    c. for **Wrongful Acts** occurring in an **Outside Directorship** after the date an **Insured Person** ceases to serve in such position with the consent of the **Insured Organization**;

    d. based upon, arising from, or in consequence of an **Insured Person** having gained in fact any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled;

    e. based upon, arising from, or in consequence of any willful violation of any statute or regulation by an **Insured**, if a judgment or other final adjudication adverse to such **Insured** establishes such willful violation;

    f. for an accounting of profits made from the purchase or sale by an **Insured Person** of securities of the **Insured Organization** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any federal, state or local statutory law or common law; or

    g. for libel, slander, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, assault or battery.

*Exclusions Applicable to any BPL Claim or any Lending Claim*

11. The Company shall not be liable for **Loss** on account of any **BPL Claim** or any **Lending Claim**:

    a. based upon, arising from, or in consequence of the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank or banking firm, insurance company, investment company, investment banker or any broker or dealer in securities or commodities, or other such organizations of a similar nature, or the failure to pay or suspension of payment by such entities;

    b. based upon, arising from, or in consequence of any pension, profit sharing, health, **Welfare Benefit Plan** or **Employee Benefit Plan** or trust, including but not limited to any violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar provision of any federal, state or local statutory law or common law, sponsored or established by the **Insured Organization** for the employees of the **Insured Organization**;

*Exclusions Applicable to any BPL Claim or any Lending Claim*
*(continued)*

c.  by, on behalf of, or at the behest of any **Insured** against any other **Insured**, or by, on behalf of, or at the behest of any business concern which is operated, managed or owned, directly or indirectly, in whole or in part by any **Insured**. However, this Exclusion shall not apply:

   i.   where the claimant is an **Insured Person** and was provided with or was entitled to be provided with **Professional Services** or **Lending Services** and is bringing such **BPL Claim** or **Lending Claim** solely in the capacity as a customer of the **Insured Organization**, where such **BPL Claim** or **Lending Claim** is brought without the solicitation, assistance or participation of any other **Insured**;

   ii.  to a **BPL Claim** or **Lending Claim** brought or maintained by an **Insured Person** for contribution or indemnity, if the **BPL Claim** or **Lending Claim** directly results from another **Claim** covered under this Policy;

d.  based upon, arising from, or in consequence of the liability of a party, other than any **Insured**, assumed by any **Insured** pursuant to a contract, except liability for **Loss** that the **Insured** would have had in the absence of such contract;

e.  by, on behalf of, or at the behest of any person or concern (including but not limited to any shareholder, bondholder, policyholder or debenture holder), their estates, heirs, legal representatives or assigns, with a legal or equitable interest in any stock, bond, debenture, or other form of security of the **Insured Organization**, or any other ownership interest, when such **BPL Claim** or **Lending Claim** is based upon, arises out of or pertains to any interest in said security. However, this Exclusion shall not apply where:

   i.   the claimant is an **Insured Person** and was provided with or was entitled to be provided with **Professional Services** or **Lending Services** and is bringing such **BPL Claim** or **Lending Claim** solely in his or her capacity as a customer of the **Insured Organization**; and

   ii.  such **BPL Claim** or **Lending Claim** is brought without the solicitation, assistance or participation of any other **Insured**;

f.  based upon, arising from, or in consequence of mechanical or electronic failure, breakdown or malfunction of any machine or system of machines;

g.  based upon, arising from, or in consequence of:

   i.   the underwriting, securitizing, syndicating, promoting, or market making (as defined in Section 3(A)(38) of the Securities Exchange Act of 1934 as amended) of any debt or equity security or other evidence of indebtedness, or any other similar investment banking activity;

   ii.  the rendering of advice or recommendations regarding any actual, attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, insolvency proceeding, reorganization, capital restructuring, recapitalization, spin-off, primary or secondary offering of debt or equity securities or other evidence of indebtedness, dissolution or sale of all or substantially all of the assets or stock of a business entity or any effort to raise or furnish capital or financing for any enterprise or entity;

   iii. the rendering of a fairness opinion regarding the valuation of any assets or business entity not held by any **Insured** as trustee;

*Exclusions Applicable to any BPL Claim or any Lending Claim (continued)*

    iv.    any acquisition or sale of securities by any **Insured** for such **Insured's** own account, or

any disclosure requirements in connection with any of the foregoing;

h.    based upon, arising from, or in consequence of any function or activity as a receiver, trustee in bankruptcy, conservator or assignee for the benefit of creditors;

i.    based upon, arising from, or in consequence of any **Insured's** service as a director, officer, trustee, employee or member of any entity other than the **Insured Organization**, even if directed or requested to serve such other entity;

j.    based upon, arising from or in consequence of diminution in value of money, securities, property or any other item of value;

k.    based upon, arising from, or in consequence of serving as a trustee under bond indenture;

l.    based upon, arising from, or in consequence of conflicts of interest, acting in bad faith or gaining any profit or advantage to which one is not legally entitled or on the part of any **Insured** or any person for whose actions an **Insured** is legally responsible;

m.    for discrimination, libel, slander, wrongful termination of employment, disparagement, sexual harassment, violation of rights of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, assault or battery;

n.    based upon, arising from, in consequence of, or in any way involving, directly or indirectly, any extension of credit which, at the time of its making, was in excess of the legal lending limit of the **Insured Organization**;

o.    based upon, arising from, in consequence of, or in any way involving, directly or indirectly, any transaction that at the inception date of this Policy or any policy underwritten by the Company for which this Policy is a renewal or replacement, was a **Past Due Loan** or **Classified Loan** or represented a renewal, repayment or restructuring of, or was otherwise related in whole or in part, to any **Past Due Loan** or **Classified Loan**. However, this Exclusion shall not apply to **Defense Costs**;

p.    based upon, arising from, or in consequence of, or in any way involving, directly or indirectly, any act arising out of the operation or control of any entity or property that the **Insured** acquired as security or collateral for any loan or extension of credit;

q.    based upon, arising from, or in consequence of, or in any way involving, directly or indirectly, the purchase or participation in any loan or any transaction in the nature of a loan not originating with the **Insured Organization**. However, this Exclusion shall not apply to **Loan Servicing**;

r.    based upon, arising from, or in consequence of disputes involving fees or charges for the **Insureds'** services; or

s.    based upon, arising from, or in consequence of **Financial Impairment**.

| | | |
|---|---|---|
| *Severability of Exclusions* | 12. | With respect to the Exclusions herein, in order to determine if coverage is available: |

    a.  no fact pertaining to or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person**; and

    b.  all facts pertaining to and knowledge possessed by any past, present or future chief financial officer, in-house general counsel, chief executive officer, President or Chairman of any **Insured Organization** shall be imputed to any **Insured Organization**.

| | | |
|---|---|---|
| *Limit of Liability and Deductible* | 13. | All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of any **Insured** shall be deemed one **Loss**, and such **Loss** shall be deemed to have originated in the earliest **Policy Period** in which a **Claim** is first made alleging any such **Wrongful Act** or **Interrelated Wrongful Acts**. |

The Company's maximum liability for each **Loss**, whether covered under one or more Insuring Clauses, shall be the Limit of Liability for each **Loss** set forth in the Declarations. The Company's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more Insuring Clauses, shall be the Aggregate Limit of Liability for each **Policy Period** set forth in the Declarations.

The Company's liability under this Policy shall apply only to that part of each **Loss** which is excess of the applicable Deductible Amount set forth in the Declarations and such Deductible Amount shall be borne by the **Insured** uninsured at the **Insured's** own risk.

If a single **Loss** is covered by more than one Insuring Clause, and if more than one Deductible Amount applies to such **Loss**, the largest applicable Deductible Amount shall be the Deductible Amount applicable to such **Loss**.

If the Company or any of its subsidiaries or affiliated companies makes payment under another policy on account of any **D&O Claim** that is also covered under Insuring Clause D, Outside Directorship Liability, the Limit of Liability for this Policy shall be reduced by the amount of such payment.

The Limit of Liability available during the Extended Reporting Period, if exercised, shall be the remaining portion, if any, of the Limit of Liability provided by the immediately preceding **Policy Period**.

| | | |
|---|---|---|
| *Presumptive Indemnification* | 14. | If the **Organization**: |

    a.  fails or refuses, other than for reason of **Financial Impairment**, to indemnify the **Insured Person** for **Loss**; and

    b.  is permitted or required to indemnify the **Insured Person** for such **Loss** pursuant to the fullest extent permitted by law,

then, notwithstanding any other conditions, provisions or terms of this Policy to the contrary, any payment by the Company of such **Loss** shall be subject to:

    i.  the applicable Insuring Clause Deductible Amount set forth in the Declarations for this Policy; and

    ii.  all of the Exclusions of this Policy.

| | | |
|---|---|---|
| **Defense and Settlement** | 15. | The Company shall have the right and duty to defend any **Claim** covered by this Policy. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend shall cease upon exhaustion of the Company's applicable Limit of Liability set forth in the Declarations. |

The Company may make any investigation it deems necessary and may, with the consent of the **Insured**, make any settlement of any **Claim** it deems expedient. If such **Insured** withholds consent to such settlement, the Company's liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the Company could have settled such **Claim** plus costs, charges and expenses accrued as of the date such settlement was proposed in writing by the Company to such **Insured**.

No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

All **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests, and agree they will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

**Defense Costs** are part of and not in addition to the applicable Limit of Liability set forth in the Declarations, and the payment by the Company of **Defense Costs** reduces such applicable Limit of Liability.

| | | |
|---|---|---|
| **Allocation** | 16. | If any **Insured** in an **Employment Claim**, **Fiduciary Claim**, **BPL Claim** or **Lending Claim** or if **Insured Persons** in a **D&O Claim** incur both **Loss** that is covered by this Policy and also loss which is not covered by this Policy, either because such **Claim** includes both covered and uncovered matters, or because such **Claim** is made against both covered and uncovered parties, then coverage will apply as follows: |

| | | | |
|---|---|---|---|
| | | a. | 100% of all **Defense Costs** incurred only by such **Insured** on account of such **Claim** will be considered covered **Loss**; and |
| | | b. | all remaining loss other than **Defense Costs**, incurred by such **Insured** on account of such **Claim**, will be allocated between covered **Loss** and uncovered loss and covered and uncovered parties, based upon the relative legal exposures of the parties to such matters. |

| | | |
|---|---|---|
| **Arbitration** | 17. | Any dispute between any **Insured** and the Company based upon, arising from or in connection with coverage under this Policy, including but not limited to any dispute sounding in contract or tort, shall be submitted to binding arbitration. |

The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the Company and a third independent arbitrator selected by the first two arbitrators.

| | | |
|---|---|---|
| *Other Insurance* | 18. | If **Loss** arising from any **Claim** made against any **Insured** is insured under any other valid policies, prior or current, then such **Loss** shall be covered hereunder, subject to all limitations, conditions, provisions and other terms hereunder, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability in this Policy. |
| *Outside Directorship* | 19. | Any coverage provided for a **D&O Claim**, shall not be construed to extend to any **Outside Entity** or to any of the officers, directors, or employees of such **Outside Entity** other than the **Insured Person** serving in the capacity of an **Outside Directorship**. Such coverage shall be specifically excess of any insurance or indemnity from such **Outside Entity** or any other organization, available to such **Insured Person** by reason of serving in such **Outside Directorship**. |

## Changes in Exposure

| | | |
|---|---|---|
| *Acquisition or Creation of Another Organization* | 20. | If an **Insured Organization** after the inception date of this Policy: |

    a.    acquires securities or voting rights in another organization, or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or

    b.    acquires any organization by merger into or consolidation with an **Insured Organization**,

then such organization, its **Insured Persons, Sponsored Plans** and **Insured Plans** shall be **Insureds** under this Policy, but only with respect to **Wrongful Acts** or **Interrelated Wrongful Acts** where all or part of such acts occurred after such acquisition or creation, unless the Company agrees, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for **Wrongful Acts** occurring prior to such acquisition or creation.

If the fair value of the assets of the acquired or created organization exceeds 25% of the combined total assets of all **Insured Organizations** as reflected in their most recent audited consolidated financial statements, the **Parent Organization** shall give written notice of such acquisition or creation to the Company as soon as practicable together with such information as the Company may require, and any reasonable additional premium shall be paid.

| | | |
|---|---|---|
| *Acquisition of Insured Organization by Another Organization* | 21. | If: |

    a.    the **Parent Organization** merges into or consolidates with another organization; or

    b.    another organization, person or group of organizations or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization or person of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Parent Organization**; or

    c.    the **Insured Organization** completely ceases to actively engage in its primary business ("cessation"); or

*Changes in Exposure*

| | |
|---|---|
| *Acquisition of Insured Organization by Another Organization (continued)* | d.   **Financial Impairment** occurs,<br><br>then coverage under this Policy shall continue until termination of this Policy, but only with respect to **Claims** where all or part of the **Wrongful Acts** or **Interrelated Wrongful Acts** occurred prior to such merger, consolidation or acquisition, cessation or **Financial Impairment**. The **Parent Organization** shall give written notice of such merger, consolidation or acquisition, cessation or **Financial Impairment** to the Company as soon as practicable, together with such information as the Company may require. |
| *Employee Stock Ownership Plan* | 22.   No coverage for a **Fiduciary Claim** shall be afforded pursuant to Section 20 or Section 25 of this Policy, with respect to any Employee Stock Ownership Plan unless the Company, by specific endorsement hereto, agrees to afford such coverage. |
| *Cessation of Subsidiaries* | 23.   In the event an organization ceases to be a **Subsidiary** during the **Policy Period**, then coverage under this Policy with respect to such **Subsidiary** and its **Insured Persons, Sponsored Plans** and **Insured Plans** shall continue until termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the date such organization ceased to be a **Subsidiary**. |
| *Termination of Sponsored Plan or Insured Plan* | 24.   If an **Insured Organization** terminates a **Sponsored Plan** or an **Insured Plan** before or after the inception date of this Policy, then coverage under this Policy with respect to such terminated **Sponsored Plan** or **Insured Plan** shall continue until termination of this Policy for those who were an **Insured** at the time of such plan termination, or who would have been an **Insured** at the time of such plan termination if this Policy had been in effect, with respect to **Wrongful Acts** occurring prior to or after the date of such plan termination. |
| *Creation of Sponsored Plan or Insured Plan* | 25.   If an **Insured Organization** creates a **Sponsored Plan** or an **Insured Plan** during the **Policy Period**, then coverage shall be afforded under this Policy, subject to its terms and conditions for such **Sponsored Plan** or **Insured Plan** but only with respect to **Wrongful Acts** occurring after the date of creation of such **Sponsored Plan** or **Insured Plan**. |
| *Representations and Severability* | 26.   In granting coverage to any **Insured**, the Company has relied upon the declarations and statements in the written application for this Policy and for any policy for which this Policy is a renewal or replacement, including the written applications submitted to any other insurer which are specified in Section F., Prior Insurance, of the Application for this Policy. Such declarations and statements are the basis of such coverage and shall be considered as incorporated in and constituting a part of this Policy. |

| Representations and Severability (continued) | | Such written application for coverage shall be construed as a separate application for coverage by each **Insured Person**. With respect to the declarations and statements in the written application for coverage, in order to determine if coverage is available: |
|---|---|---|
| | a. | all facts pertaining to and knowledge possessed by any past, present or future chief financial officer, in-house general counsel, chief executive officer, President or Chairman or any **Insured Organization** shall be imputed to the **Insured Organization**; and |
| | b. | no declaration or statement in the application or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person**. |

**Reporting and Notice**   27.   Any **Insured** shall, as a condition precedent to exercising their rights under this Policy, give the Company written notice as soon as practicable of any **Claim**.

If, during the **Policy Period**, an **Insured** becomes aware of circumstances which could give rise to a **Fiduciary Claim, D&O Claim** or **BPL Claim** and gives written notice of such circumstances to the Company, then any **Fiduciary Claim, D&O Claim** or **BPL Claim** subsequently arising from such circumstances, shall be considered to have been made during the **Policy Period** in which the circumstances were first reported to the Company.

All **Insured**s shall, as a condition precedent to exercising their rights under this Policy, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which such **Insured** first became aware of the **Claim** or circumstances.

Notice to the Company under this Policy shall be given in writing addressed to:

a.   for notice of **Claim** or circumstances which could give rise to **Claim**:

Claims Department, Attention D&O Claim Manager
Chubb Group of Insurance Companies
15 Mountain View Road
Warren, New Jersey 07059

b.   for all other notices:

Department of Financial Institutions
Chubb Group of Insurance Companies
15 Mountain View Road
Warren, New Jersey 07059

Such notice shall be effective on the date of receipt by the Company at such address.

**Territory**   28.   Coverage shall extend anywhere in the world.

| | | |
|---|---|---|
| *Valuation and Foreign Currency* | 29. | All premiums, limits, deductibles, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or any element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in <u>The Wall Street Journal</u> on the date the final judgment is entered, the amount of the settlement is agreed upon or any part of **Loss** is due. |
| *Subrogation and Waiver of Recourse* | 30. | In the event of any payment under this Policy, the Company shall be subrogated, to the extent of such payment, to all the **Insured's** rights of recovery, and such **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of such **Insured**. |
| | | The Company shall have no right of recourse against any **Insured** with respect to any **Fiduciary Claim**, if this Policy was purchased by an **Insured** other than a **Sponsored Plan** or an **Insured Plan**. |
| *Action Against the Company* | 31. | No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability, nor shall the Company be impleaded by such **Insured** or the **Insured's** legal representatives. |
| *Bankruptcy or Insolvency* | 32. | Bankruptcy or insolvency of an **Insured** or of the estate of such **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights under this Policy. |
| *Authorization Clause* | 33. | By acceptance of this Policy, the **Parent Organization** agrees to act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claim** or termination, the payment of premiums and the receiving of any return premiums that may become due under this Policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this Policy, and each **Insured** agrees that the **Parent Organization** shall act on their behalf. |
| *Alteration and Assignment* | 34. | No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by a duly authorized representative of the Company. |

| *Termination of Policy* | 35. | This Policy shall terminate at the earliest of the following times: |

    a.    upon the receipt by the Company of written notice of termination from the **Parent Organization**;

    b.    upon expiration of the **Policy Period** as set forth in the Declarations of this Policy;

    c.    ten (10) days after receipt by the **Parent Organization** of a written notice of termination from the Company based upon non-payment of premium;

    d.    sixty (60) days after receipt by the **Parent Organization** of a written notice of non-renewal from the Company; or

    e.    at such other time as may be agreed upon by the Company and the **Parent Organization**.

The Company shall refund the unearned premium computed at customary short rates if the Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata.

| *Definitions* | 36. | When used in this Policy: |

**Administration** means giving advice to employees, handling of records, or effecting enrollment, termination or cancellation of employees under a **Sponsored Plan** or **Insured Plan**.

**Benefits** means perquisites, fringe benefits, payments in connection with an **Employee Benefit Plan** and any other payment, other than salary or wages, to or for the benefit of an employee arising out of the employment relationship.

**BPL Claim** means:

    a.    a written demand for monetary damages;

    b.    a civil proceeding commenced by the service of a complaint or similar pleading;

    c.    a criminal proceeding commenced by a return of an indictment; or

    d.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

brought by or on behalf of a customer of the **Insured** against an **Insured** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured** solely while performing **Professional Services**.

**Claim** means any **Employment Claim, Fiduciary Claim, D&O Claim, BPL Claim**, or **Lending Claim**. A **Claim** shall be deemed to have been made against the **Insureds** on the date any **Insured** first received written demand for monetary damages, the date that the judicial or administrative proceeding is served upon any **Insured** in any state, provincial or federal court or administrative agency, or the date any **Insured** first received written notice regarding the filing of a notice of charges, formal investigative order or similar document from a state, provincial or federal regulatory agency.

**Classified Loan** means:

    a.    any loan, or any transaction in the nature of a loan or extension of credit; or

    b.    any false or genuine note, account, agreement, invoice or other evidence of debt assigned or sold, discounted or otherwise acquired, whether or not involving the **Insured Organization** as lender or borrower, and whether procured in good faith or through fraud, artifice, or false pretense,

which has been designated as substandard, doubtful or loss by the **Insured** or by any applicable state or federal regulatory or supervisory agency or authority.

**Definitions**
(continued)

**Defense Costs** means reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred in defending any **Claim** and the premium for appeal, attachment or similar bonds.

**D&O Claim** means:

a.    a written demand for monetary damages;

b.    a civil proceeding commenced by the service of a complaint or similar pleading;

c.    a criminal proceeding commenced by a return of an indictment; or

d.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

against any **Insured Person** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured Person** solely in his or her **Insured Capacity** or by such **Insured Person** serving in any **Outside Directorship**, including any appeal therefrom.

**Employee Benefit Plan** means a plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

**Employment Claim** means:

a.    a written demand for monetary damages;

b.    a civil proceeding commenced by the service of a complaint or similar pleading;

c.    an arbitration proceeding; or

d.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

which is brought and maintained by or on behalf of any past, present or prospective employee of any **Insured Organization**, against any **Insured** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured Organization** or by such **Insured Person** solely in his or her **Insured Capacity**, including any appeal therefrom, in connection with any actual or alleged wrongful dismissal, discharge or termination of employment, breach of any oral or written employment contract or quasi-employment contract, employment-related misrepresentation, violation of employment discrimination laws (including workplace and sexual harassment), wrongful failure to employ or promote, wrongful discipline, wrongful deprivation of a career opportunity, failure to grant tenure, negligent evaluation, invasion of privacy, employment-related defamation or employment-related wrongful infliction of emotional distress.

**Fiduciary Claim** means:

a.    a written demand for monetary damages;

b.    a civil proceeding commenced by the service of a complaint or similar pleading;

c.    a criminal proceeding commenced by a return of an indictment;

d.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

**Definitions**
*(continued)*

e.  a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation,

against an **Insured** for a **Wrongful Act** or Interrelated **Wrongful Act** in connection with:

i.  any breach of the responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Employee Retirement Income Security Act of 1974, as amended, or by the common or statutory law of the United States, or any state or other jurisdiction anywhere in the world;

ii.  any other matter claimed against any **Insured Organization** or any **Insured Person** solely because of such **Insured Organization's** or such **Insured Person's** service as a fiduciary of any **Sponsored Plan**; or

iii.  any negligent act, error or omission in the **Administration** of any **Sponsored Plan** or **Insured Plan**,

including any appeal therefrom.

**Financial Impairment** means the status of the **Insured Organization** resulting from:

i.  the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate such **Insured Organization**; or

ii.  the **Insured Organization** becoming a debtor in possession.

**Insured** means any **Insured Organization** or any **Insured Person**.

**Insured Capacity** means the position held by an **Insured Person** in any **Insured Organization** but shall not include any position in any organization other than such **Insured Organization**, even if such **Insured Organization** directed or requested such **Insured Person** to serve in such other position.

**Insured Organization** means the **Parent Organization** or any **Subsidiary**, and solely for purposes of any **Fiduciary Claim**, any **Sponsored Plan** or **Insured Plan**.

**Insured Person** means all past, present or future duly elected directors, or duly elected or appointed officers of the **Insured Organization** and as respects any **Employment Claim**, **Fiduciary Claim**, **BPL Claim**, or **Lending Claim**, employees of the **Insured Organization**.

**Insured Plan** means any government mandated insurance for workers compensation, unemployment, social security or disability benefits for employees of the **Insured Organization**.

**Interrelated Wrongful Act**s means all causally connected **Wrongful Acts**.

**Lending Claim** means:

a.  a written demand for monetary damages;

b.  a civil proceeding commenced by the service of a complaint or similar pleading;

c.  a criminal proceeding commenced by a return of an indictment; or

d.  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

brought by or on behalf of a customer of the **Insured** against any **Insured** for a **Wrongful Act** or **Interrelated Wrongful Act** by such **Insured** solely while performing **Lending Services**, including any appeal therefrom.

*Definitions*
*(continued)*

**Lending Customer** means any person or entity which is not affiliated with the **Insured Organization** and to which an extension of credit, an agreement to extend credit, or a refusal to extend credit was made or negotiated on behalf of the **Insured Organization**.

**Lending Services** means any act performed by an **Insured** for a **Lending Customer** of the **Insured Organization** arising from the extending or refusal to extend credit or granting or refusal to grant a loan or any transaction in the nature of a loan. However, **Lending Services** shall not include any **Professional Service**.

**Loan Servicing** means the servicing of any loan, lease or extension of credit (whether consumer, commercial, mortgage banking or otherwise, but not including financing for investment banking, or leveraged or management buyouts). **Loan Servicing** includes but is not limited to the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, determination of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property). **Loan Servicing** shall not include any act of restructure, termination, transfer, repossession or foreclosure, or any act arising out of the operation or control of any entity or property that the **Insured** acquired as security or collateral for any loan, lease or extension of credit.

**Loss** means the amount which an **Insured** becomes legally obligated to pay, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**. **Loss** does not include:

a.  any amount not indemnified by any **Insured Organization** for which any **Insured Person** is absolved from payment by reason of any covenant, agreement or court order;

b.  the future salary or **Benefits** of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution;

c.  any amount incurred by any **Insured Organization** (including its board of directors or any committee of the board of directors) in connection with the investigation or evaluation of any **Claim** or potential **Claim** by or on behalf of any **Insured Organization**;

d.  fines or penalties imposed by law including but not limited to punitive or exemplary damages or the multiple portion of any multiplied damage award;

e.  matters uninsurable under the law pursuant to which this Policy is construed;

f.  principal, interest or other moneys accrued or due, either now or in the future, but not yet paid to the **Insured Organization** as a result of any loan, any transaction in the nature of a loan or an extension of credit;

g.  loss of the actual money, securities, property or other items of value in the custody or control of any **Insured**, its agent, or in transit; or

h.  amounts otherwise reimbursable to any **Insured** by any trust, estate, plan or fund or any similar entity, or the sponsor of any such trust, estate, plan or fund.

*Definitions*
*(continued)*

**Outside Directorship** means the position of director, officer, trustee, governor or any equivalent executive position in an **Outside Entity** held by an officer of the **Insured Organization**, if service in such position was with the knowledge and consent or at the request of the **Insured Organization**.

**Outside Entity** means any non-profit corporation, community chest, fund or foundation that is not included in the definition of **Insured Organization** and that is exempt from federal income tax as an organization described in Section 501(c) (3) of the Internal Revenue Code of 1986, as amended.

**Parent Organization** means the entity that is named in the Declarations, as legally constituted at the inception date of this Policy.

**Past Due Loan** means:

a.    any loan or any transaction in the nature of a loan or extension of credit which has been more than ninety (90) days delinquent in repayment according to its term or has been in non-accrual status; or

b.    any false or genuine note, account, agreement, invoice, or other evidence of debt assigned or sold, discounted or otherwise acquired, whether or not involving the **Insured Organization** as a lender or borrower, and whether procured in good faith or through fraud, artifice or false pretenses, which has been more than ninety (90) days delinquent in repayment according to its terms or has been in non-accrual status.

**Policy Period** means the period specified in the Declarations, subject to termination in accordance with Section 35 of this Policy. If this period is less than or greater than one year, then the Limits of Liability specified in the Declarations shall be the Company's maximum Limit of Liability for the entire period.

**Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or any state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

**Professional Services** means only those services performed or required to be performed by an **Insured** for or on behalf of a customer of an **Insured**, pursuant to an agreement between such customer and such **Insured** for a fee, commission or other monetary consideration or other remuneration which inures to the benefit of such **Insured**. **Professional Services** shall not include:

a.    medical or health care services, real estate appraisal services, architectural or construction management services, the practice of law or the rendering of legal services;

b.    services performed by any entity which the **Insureds** shall have acquired ownership or control as security for a loan or other extension of credit; or

c.    **Lending Services**.

**Sponsored Plan** means:

a.    an **Employee Benefit Plan** which is operated solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization for the benefit of the employees of the **Insured Organization** located anywhere in the world and which existed at the inception date of this Policy or any policy of which this Policy is a renewal or which is created or which is acquired after the inception of this Policy, subject to the provisions outlined in this Policy;

*Definitions*
*(continued)*

b.  any other plan, fund, or program specifically included as an **Insured Organization**. However, **Insured Organization** shall not include any multi-employer plan as defined in the Employee Retirement Income Security Act of 1974, as amended; or

c.  any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, sponsored solely by the **Insured Organization** for the benefit of the employees of the **Insured Organization**.

**Subsidiary** means any organization, at or prior to inception of this Policy, in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more **Insured Organizations**.

**Welfare Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

**Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted or allegedly committed or attempted, before or during the **Policy Period** by any **Insured**.

For the purposes of these definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

Effective date of
this endorsement:　April 30, 2005

**Federal Insurance Company**

Endorsement No.:　1

To be attached to and form a part of Policy
Number:　　　　　7023-4702

Issued to:　PARKWAY BANCORP, INC.

---

### SEPARATE LIMITS ENDORSEMENT

It is agreed that:

1.　The Limits of Liability set forth in the Declarations are deleted in their entirety and replaced with
　　the following:

| Insuring Clause | Each **Loss** Limit of Liability | Aggregate Limit of Liability Each **Policy Period** |
|---|---|---|
| A.Employment Liability | $5,000,000 | $5,000,000 |
| B.Fiduciary Liability | | |
| C.Directors & Officer Liability | $2,000,000 | $2,000,000 |
| D.Outside Directorship Liability | $10,000,000 | $10,000,000 |
| E.Bankers Professional Liability | | |
| F.Lending Liability | $10,000,000 | Incl. in D&O |
| | $10,000,000 | $10,000,000 |
| | $2,000,000 | Incl. in BPL |

2.　The Limit of Liability and Deductible provision is amended by deleting the second paragraph in its
　　entirety and replacing it with the following:

　　The Company's maximum liability for each **Loss**, covered under any one Insuring Clause, shall
　　be the Each **Loss** Limit of Liability for such Insuring Clause set forth in the Declarations. The
　　Company's maximum aggregate liability for all **Loss** on account of all **Claims** first made during
　　the same **Policy Period**, covered under any one Insuring Clause, shall be the Each **Policy
　　Period** Aggregate Limit of Liability for such Insuring Clause set forth in the Declarations. If Loss
　　is covered under more than one Insuring Clause, then only one Limit of Liability for Each **Loss**
　　and one Limit of Liability for Each **Policy Period** shall apply, which shall be the largest applicable
　　Limit of Liability for Each **Loss** and for Each **Policy Period** set forth in the Declarations.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:　May 18, 2005

By _____
　　　　　　　Authorized Representative

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:   2

To be attached to and form a part of Policy
Number:              7023-4702

Issued to:   PARKWAY BANCORP, INC.

---

**BREACH OF WRITTEN EMPLOYMENT CONTRACT EXCLUSION ENDORSEMENT**

It is agreed that Section 7., Exclusions Applicable to any Employment Claim, is amended by adding the
following:

e.      which constitutes an actual or alleged breach of any written employment contract.  This exclusion
        shall not apply to the extent the **Insured** would have been liable for such **Loss** in the absence of
        such written employment contract.


ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.


Date:  May 18, 2005                                     By_____
                                                              Authorized Representative

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:   3

To be attached to and form a part of Policy
Number:                7023-4702

Issued to:   PARKWAY BANCORP, INC.

**ILLINOIS AMENDATORY ENDORSEMENT**

It is agreed that:

1.   Section 4., Extended Reporting Period, is deleted in its entirety and replaced with the following:

Extended Reporting Period

4.   If this Policy is terminated or nonrenewed for any reason, the **Parent Organization,** on behalf of the **Insureds,** shall have the right, upon payment of additional premium of 75% of the annual Policy premium, to an extension of the coverage granted by this Policy for a period of one (1) year following the effective date of termination or nonrenewal, but only for a **Wrongful Act** occurring prior to the effective date of termination or nonrenewal.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days following the effective date of termination or nonrenewal.  Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period.**

If this Policy is terminated for nonpayment of premium, the Extended Reporting Period set forth above shall not be effective until:

a.   the earned premium for the terminated **Policy Period** shall be paid in full, and

b.   the additional premium for the Extended Reporting Period is paid in full.

2.   Section 13., Limit of Liability and Deductible, is deleted in its entirety and replaced with the following:

Limit of Liability and Deductible

13.   All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of any Insured shall be deemed one **Loss**, and such **Loss** shall be deemed to have originated in the earliest **Policy Period** in which a **Claim** is first made alleging any such **Wrongful Act** or **Interrelated Wrongful Acts**.

The Company's maximum liability for each **Loss**, whether covered under one or more Insuring Clauses, shall be the Limit of Liability for each **Loss** set forth in the Declarations. The Company's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more Insuring Clauses, shall be the Aggregate Limit of Liability for each **Policy Period** set forth in the Declarations.

The Company's liability under this Policy shall apply only to that part of each **Loss** which is excess of the applicable Deductible Amount set forth in the Declarations and such Deductible Amount shall be borne by the **Insured** uninsured at the **Insured's** own risk.

If a single **Loss** is covered by more than one Insuring Clause, and if more than one Deductible Amount applies to such **Loss**, the largest applicable Deductible Amount shall be the Deductible Amount applicable to such **Loss**.

The Limit of Liability available during the Extended Reporting Period, if exercised, shall be the remaining portion, if any, of the Limit of Liability provided by the immediately preceding **Policy Period**.

3.   Section 17., Arbitration, is deleted in its entirety and replaced with the following:

Arbitration

17.   Any dispute between any **Insured** and the Company based upon, arising from or in connection with coverage under this Policy, including but not limited to any dispute sounding in contract or tort, may be submitted to binding arbitration if both the **Insured** and the Company mutually agree to arbitration.  As an alternative to arbitration, either the **Insured** or the Company may file suit to resolve any dispute.

Selection of the arbitration panel.  The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the Company and a third independent arbitrator selected by the first two arbitrators.

4.   Section 18., Other Insurance, is deleted in its entirety and replaced with the following:

Other Insurance

18.   If any **Loss** arising from any **Claim** made against any **Insured** is insured under any other valid policy(ies), prior or current, then the Company shall not be liable under this Policy for a greater proportion of such **Loss** than would be payable if each insurer contributes an equal share until the share of each insurer equal to the lowest applicable limit of liability under any one policy or the full amount of the **Loss** is paid.  With respect to any amount of **Loss** not so paid, the remaining insurers shall then continue to contribute equally to the remaining amount of the **Loss** until each such insurer has paid its limit of liability in full or the full amount of the **Loss** is paid, whichever occurs first.  However, this Section shall not apply if such other insurance is purchased specifically to apply in excess of the Limits of Liability stated in the Declarations of this Policy.

5.   Section 36., Definitions, is amended by deleting the definition of **Defense Costs** in its entirety and replacing it with the following:

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers, general partners, or employees of the **Organization** or the salaries of the employees, officers or staff attorneys of the Company) incurred in defending and investigating **Claims** and the premium for appeal, attachment or similar bonds.

6.   Section 36., Definitions, is amended by deleting the definition of **Loss** in its entirety and replacing it with the following:

**Loss** means the total amount which the **Insured** becomes legally obligated to pay as a result of each **Claim** or for all **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised, made against the **Insureds** for **Wrongful Acts** for which coverage applies, including, but not limited to, compensatory damages, punitive or exemplary damages payable due to vicarious liability only, multiplied damages, judgments, settlements, costs and **Defense Costs**.

For the purpose of resolving any dispute between the Company and the **Insured** regarding whether the punitive or exemplary damages or the multiplied portion of any multiplied damage award specified above are insurable under this Policy, the law of the jurisdiction most favorable to the insurability of those damages shall control, provided that such jurisdiction is where:

a.    those damages were awarded or imposed;

b.    any **Wrongful Act** occurred for which such damages were awarded or imposed;

c.    any **Insured Organization** is incorporated or has its principal place of business; or

d.    the Company is incorporated or has its principal place of business.

**Loss** does not include:

a.    regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**;

b.    loss of the actual money, securities, property or other items of value in the custody or control of the **Insureds**; or diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value unless caused by a **Wrongful Act** of the **Insureds** in the execution or implementation of investment advice or investment decisions;

c.    fines or penalties imposed by law or any other matters or sanctions which may be deemed uninsurable under the law pursuant to which this Policy shall be interpreted;

d.    any amounts which constitute premiums; fees and charges; return or refund of premiums; commissions or taxes; or loss arising out of any commingling of funds; or

e.    principal, interest, or other moneys either paid, accrued or due as the result of any loan, lease or extension of credit.


ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.


Date:  May 18, 2005                                     By _____

                                                                        Authorized Representative

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:   4

To be attached to and form a part of Policy
Number:                7023-4702

Issued to:   PARKWAY BANCORP, INC.

---

### ILLINOIS AMENDATORY ENDORSEMENT - CANCELLATION

It is agreed that Section 35., Termination of Policy, is deleted in its entirety and replaced with the following:

Termination of Policy

35.    Cancellation

All notices of cancellation of insurance must be mailed at least thirty (30) days prior to the effective date of cancellation during the first sixty (60) days, of coverage.

After this Policy has been effective for sixty-one (61) days or more, all notices must be mailed at least sixty (60) days prior to the effective date of cancellation.  All such notices shall include a specific explanation of the reason or reasons for cancellation and shall be mailed to the **Parent Organization**, at the last mailing address known to the Company.  However, where cancellation is for nonpayment of premium, at least ten(10) days notice of cancellation shall be given.

If this Policy has been in effect for sixty (60) days, it may not be cancelled except for one of the following reasons:

a.    nonpayment of premium;

b.    the Policy was obtained through a material misrepresentation;

c.    violation by the **Parent Organization** or any **Insured** of any Policy terms and conditions;

d.    the risk originally accepted has measurably increased;

e.    certification to the Director of the Illinois Insurance Department of the loss of reinsurance by the Company which provided coverage to the Company for all or a substantial part of the underlying risk insured; or

f.    a determination by the Director of the Illinois Insurance Department that the continuation of the Policy could place the Company in violation of the insurance laws of this state.

Nonrenewal

The Company shall renew the Policy of insurance and mail to the **Parent Organization** at least sixty (60) days advance notice of its intention not to renew.  The Company shall maintain proof of the mailing of such notice on one of the following forms: a recognized U.S. Post Office form, or a form acceptable to the U.S. Post Office, or other commercial mail delivery service.  An exact and unaltered copy of such notice shall also be sent to the **Parent Organization's** broker, if known, or the agent of record and to the mortgagee or lien holder at the last mailing address known by the Company.

Should the Company fail to comply with the notice requirement, the Policy shall terminate only as provided in this section.  In the event notice is provided at least thirty (30) days, but less than sixty (60) days prior to expiration of the Policy, the Policy shall be extended for a period of sixty (60) days or until the effective date of any similar insurance procured by the **Parent Organization** or the **Insureds** whichever is less, on the same terms and conditions as the Policy sought to be terminated.  In the event notice is provided less than thirty-one (31) days prior to the expiration of the Policy, the Policy shall be extended for a period of one (1) year or until the effective date of any similar insurance procured by the **Parent Organization** or the **Insureds**, whichever is less, on the same terms and conditions as the Policy sought to be terminated unless the Company has manifested its willingness to renew at a premium which represents an increase not exceeding 30%. The premium for coverage shall be prorated in accordance with the amount of the last **Policy Period's** premium, and the Company shall be entitled to this premium for the extension of coverage and such extension may be contingent upon the payment of such premium.

Renewal of this Policy does not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal.

In all notices of intention not to renew the Policy for insurance, the Company shall provide a specific explanation of the reasons for nonrenewal.


ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.


Date:  May 18, 2005                                    By_____
                                                                      Authorized Representative

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:      5

To be attached to and form a part of Policy
Number:                    7023-4702

Issued to:   PARKWAY BANCORP, INC.

---

### AMENDED DECLARATIONS - PENDING OR PRIOR DATE ENDORSEMENT

It is agreed that ITEM 5. of the Declarations, Pending or Prior Date, is deleted in its entirety and replaced
with the following:

| Insuring Clauses: | ITEM 5.   Pending or Prior Date: |
|---|---|
| A. Employment Liability | April 30, 1998 |
| B. Fiduciary Liability | January 22, 1964 |
| C. Directors and Officers Liability | November 11, 1988 |
| D. Outside Directorship Liability | November 11, 1988 |
| E. Bankers Professional Liability | April 30, 1995 |
| F. Lending Liability | April 30, 1995 |

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  May 18, 2005

By _____
          Authorized Representative

ForeFront - Banks
Form 17-02-2833 (Ed. 6-01)                                                    Page 1

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:   6

To be attached to and form a part of Policy
Number:                7023-4702

Issued to:   PARKWAY BANCORP, INC.

---

## PROFESSIONAL SERVICES EXCLUSION ENDORSEMENT

It is agreed that Section 10., Exclusions Applicable to any D&O Claims, is amended by adding the
following:

h.        based upon, arising from or in consequence of the performing, or failure to perform, **Professional
Services**.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  May 18, 2005

By_____
                    Authorized Representative

ForeFront - Banks
Form 17-02-4935 (Ed. 11-03)                                                                                    Page 1

Effective date of
this endorsement:   April 30, 2005

**Federal Insurance Company**

Endorsement No.:   7

To be attached to and form a part of Policy
Number:                7023-4702

Issued to:   PARKWAY BANCORP, INC.

---

### MODIFIED EXTENDED REPORTING PERIOD ENDORSEMENT

It is agreed that Section 4., Extended Reporting Period, is deleted in its entirety and replaced with the
following:

Extended Reporting Period

4.    If this Policy is terminated or non-renewed for any reason, other than nonpayment of premium, then
the **Parent Organization,** on behalf of the **Insureds,** shall have the right, upon payment of
additional premium of 150% of the annual Policy premium, to an extension of the coverage granted
by this Policy for  three hundred sixty-five days (365)  following the effective date of termination or
non-renewal, but only for any **Wrongful Act** occurring prior to the effective date of termination or
non-renewal.  This right of extension shall lapse unless written notice of such election, together with
payment of the additional premium due, is received by the Company within thirty (30) days following
the effective date of termination or non-renewal.  Any **Claim** made during the Extended Reporting
Period shall be deemed to have been made during the immediately preceding **Policy Period**.  The
offer of renewal terms and conditions or premiums different from those in effect prior to renewal
shall not constitute a refusal to renew.

If the Extended Reporting Period is purchased, the entire premium shall be deemed fully earned at
the inception of the Extended Reporting Period.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  May 18, 2005                                          By _____
                                                                              Authorized Representative

Effective date of
this endorsement:  April 30, 2005

**Federal Insurance Company**

Endorsement No.:  8

To be attached to and form a part of Policy
Number:          7023-4702

Issued to:  PARKWAY BANCORP, INC.

---

### AMEND BENEFITS DUE EXCLUSION ENDORSEMENT

It is agreed that Section 9., Exclusions Applicable to any Fiduciary Claim, of this Policy is amended by
deleting Exclusion d. in its entirety and replacing it with the following:

d.    which constitutes benefits due or to become due under the terms of a **Sponsored Plan** or **Insured
      Plan**, or benefits which would be due if such **Sponsored Plan** or **Insured Plan** complied with all
      applicable law, including but not limited to **Loss** resulting from the payment of plaintiff attorneys'
      fees based upon a percentage of such benefits or payable from a common fund established to pay
      such benefits, unless, and to the extent that, (a) the **Insured** is a natural person and the benefits are
      payable by such **Insured** as a personal obligation, and (b) recovery for the benefits is based upon a
      covered **Wrongful Act**.

In the event that this endorsement conflicts with any other endorsement to this Policy, this endorsement
shall govern.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  May 18, 2005                              By _____
                                                        Authorized Representative

08CV2185   AEE
JUDGE MORAN
MAGISTRATE JUDGE NOLAN

# EXHIBIT B

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| Connie Payton, Myoung Hwa Bae, Ronald Blackstone, Sandra Degnan, Maureen S. Flaherty, Albert W. Johnson, Althea Knowles, Elizabeth Lucas, Joan S. Morrissey, Maureen J. Obermeier, Ernest J. Ojeda, Rudolph Rodriguez, Kathryn V. Shannon, Arthur J. Smith, Sr., Lester McKeever, Jr., and Walter Grady, | ) ) ) ) ) ) ) ) ) | No.     2007L011989 |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| Donald F. Flynn, Kevin F. Flynn, John P. McMahon, Joseph P. McQuaid, Kevin D. Larson, Walter P. Hanley, Parkway Bank & Trust Co., Rocco Suspenzi, Jeffrey Suspenzi, The Suspenzi Family Corporation, Nick Boscarino, Sherri Boscarino, The Sherri Boscarino Trust, Ida Hansen, Joseph Salamone, and Vito Salamone, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

### COMPLAINT

Plaintiffs, Connie Payton, Myoung Hwa Bae, Ronald Blackstone, Sandra Degnan,

Maureen S. Flaherty, Albert W. Johnson, Althea Knowles, Joan S. Morrissey, Maureen J.

Obermeier, Ernest J. Ojeda, Rudolph Rodriguez, Kathryn V. Shannon, Arthur J. Smith, Sr.,

Lester McKeever, Jr., and Walter Grady by their attorneys, Matthew J. Piers, Joshua Karsh, Cara

A. Hendrickson and Hughes, Socol, Piers, Resnick & Dym, Ltd., and plaintiff Elizabeth Lucas,

by her attorneys Royal B. Martin and Martin, Brown & Sullivan, Ltd., complain against

defendants Donald F. Flynn, Kevin F. Flynn, John P. McMahon, Joseph P. McQuaid, Kevin D.

Larson, Walter P. Hanley, Parkway Bank & Trust Co., Rocco Suspenzi, Jeffrey Suspenzi, The

Suspenzi Family Corporation, Nick Boscarino, Sherri Boscarino, The Sherri Boscarino Trust, Ida

Hansen, Joseph Salamone, and Vito Salamone as follows:

## I.  NATURE OF THE CASE

1.      This is a case about fraud, breaches of contract and violations of fiduciary duties

perpetrated on innocent investors by the defendants, whose collective actions destroyed Emerald

Casino, Inc. ("Emerald") [1], an Illinois corporation to which plaintiffs had entrusted money.

Acting in concert, the defendants have caused plaintiffs out-of-pocket losses of approximately 28

million dollars, plus many times that amount in lost future profits.  Emerald was formed for the

purpose of holding and conducting operations pursuant to an Illinois riverboat-casino "gaming"

or gambling license. The plaintiffs each entrusted money to Emerald with faith and confidence

and in reasonable reliance that the affairs of Emerald, closely regulated by the Illinois Gaming

Board ("IGB"), would be conducted in conformity with the regulations of the Board and the

Illinois Riverboat Gambling Act, 230 ILCS 10 *et seq.*, and the common law, all of which, as this

Complaint describes, were instead flagrantly violated by the defendants.  As described below,

various of the defendants lied to and concealed material information from plaintiffs and from the

IGB, and all of the defendants took or conspired to take actions causing the revocation of

Emerald's license and causing plaintiffs to lose the entirety of the amounts they had entrusted to

Emerald.

---

[1] Emerald Casino, Inc. is a closely-held Illinois corporation, without publicly traded shares, formed for the purpose of operating a casino in Illinois.  Since 2002, Emerald has been in federal Chapter 11 reorganization proceedings, *In re Emerald Casino, Inc.*, Ch. 11 Case No. 02 B 22977 (N.D. Ill.), and is not a party defendant in this action.

2.    The defendants named in this Complaint are both persons who controlled the operations of Emerald ("Insider Defendants") and others (the "Secret Investor Defendants") who, often through undisclosed investments in Emerald, facilitated or sought to facilitate the infiltration of Emerald's operations by organized crime ("Secret Investor Defendants"), and all of whom violated Illinois law, resulting in the revocation of Emerald's license and the loss of plaintiffs' money.

3.    Most of the facts relevant to matters alleged in this Complaint have been previously determined both by the IGB, see *In re the Disciplinary Action of: Emerald Casino, Inc.* (Final Board Order, Dec. 20, 2005) www.igb.state.il.us/whatsnew/emeraldfinalorder.pdf, and by the Illinois Appellate Court. *Emerald Casino, Inc. v. IGB*, No. 4-06-0051 (4th Dist. May 30, 2007).

4.    The present complaint was preceded by an earlier filing by plaintiffs in federal court. That earlier complaint alleged both federal RICO causes of action, not alleged here, and pendent state-law causes of action similar to those alleged here and arising from the same facts. The federal action was dismissed by the federal district court in an order entered on October 26, 2006, upon a determination that plaintiffs' federal RICO claims were barred by the federal Private Securities Litigation Reform Act, 18 U.S.C. § 1064(c). Having thus resolved all federal claims, the federal district court elected to relinquish jurisdiction over all state-law claims without reaching or addressing their merits. *Payton v. Flynn,* No. 06 C 465, 2006 WL 3087075 (N.D. Ill. Oct. 26, 2006).

## II.  VENUE

5.      Venue is proper in Cook County because the transactions and occurrences out of which plaintiffs' causes of action arise took place in Cook County, which is also the place of residence of most of the parties.

## III.  PARTIES

### A.    Plaintiffs

6.      Each of the plaintiffs in this case, Connie Payton, Myoung Hwa Bae, Ronald Blackstone, Sandra Degnan, Maureen S. Flaherty, Albert W. Johnson, Althea Knowles, Elizabeth Lucas, Joan S. Morrissey, Maureen J. Obermeier, Ernest J. Ojeda, Rudolph Rodriguez, Kathryn V. Shannon, Arthur J. Smith, Sr., Lester McKeever, Jr. and Walter Grady, entrusted large sums of money to the Insider Defendants as deposits toward the purchase of Emerald shares.  Each of the plaintiffs also executed a Subscription Agreement, an example of which is attached to this Complaint as Exhibit A, and a "Shareholder" agreement, an example of which is attached as Exhibit B.

7.      Possession or transfer of any ownership interest in any entity operating a casino in Illinois requires approval of the IGB.  86 Ill. Adm. Code 3000.235(a).  Due to the conduct of the defendants described in this Complaint, the IGB revoked Emerald's license in December of 2005 before approving ownership interests in Emerald for any of the plaintiffs.

8.      But for defendants' conduct, each of the plaintiffs would have acquired IGB-approved ownership interests in a licensed Emerald casino as follows:

4

| Plaintiff | Date of Subscription Agreement | Amount Paid | Percentage of Outstanding Shares |
|---|---|---|---|
| Connie Payton[2] | Aug. 31, 1999 | $375,000 | .2529% |
| Myoung Hwa Bae | Aug. 27, 1999 | $1,500,000 | 1.0177% |
| Ronald Blackstone | Aug. 26, 1999 | $500,000 | .3339% |
| Sandra Degnan | Aug. 31, 1999 | $750,000 | .5059% |
| Maureen Flaherty | Aug. 31, 1999 | $375,000 | .2529% |
| Albert W. Johnson | Aug. 31, 1999 | $3,750,000 | 2.5293% |
| Althea Knowles | Aug. 31, 1999 | $375,000 | .2529% |
| Elizabeth Lucas | Aug. 24, 1999 | $750,000 | .5059% |
| Joan S. Morrissey | Aug. 30, 1999 | $375,000 | .2529% |
| Maureen J. Obermeier | Aug. 18, 1999 | $375,000 | .2529% |
| Ernest J. Ojeda | Aug. 31, 1999 | $750,000 | .5059% |
| Rudolph Rodriguez | Dec. 21, 1999 | $255,000 | .1720% |
| Kathryn V. Shannon | Aug. 31, 1999 | $1,500,000 | 1.0117% |
| Arthur J. Smith | Aug. 31, 1999 Sept. 24, 1999 | $2,880,000 $2,500,000 | 2.9543% (total) |
| Lester McKeever, Jr. | Aug. 30, 1999 | $1,500,000 | 1.0117% |
| Walter Grady | Aug. 26, 1999 | $450,000 | .3035% |

**B.    The Insider Defendants**

9.    Defendants Donald Flynn, Kevin Flynn, John P. McMahon, Joseph P. McQuaid, Kevin D. Larson and Walter P. Hanley were officers and/or directors of Emerald at the time of the events alleged in this complaint. They are referred to in this complaint as the "Insider Defendants." Each of them engaged in misconduct, as alleged below, that caused the IGB to

[2] Walter J. Payton executed an agreement to purchase shares of Emerald's capital stock. Mr. Payton since having passed away, the plaintiff in this case on behalf of his interest is his wife, Connie Payton.

revoke Emerald's license and they intentionally concealed that misconduct conduct from

plaintiffs in order to induce plaintiffs to entrust money to Emerald.

      10.     Donald F. Flynn was Emerald's majority shareholder, a member of its board of

directors, and an officer of the corporation.[5]  Kevin F. Flynn, son of defendant Donald Flynn,

was  Emerald's Chairman and Chief Executive Officer.[6] John P. McMahon ("McMahon") was

Emerald's Senior Vice President, Chief Financial Officer, and Treasurer.[7]  Joseph P. McQuaid

("McQuaid") was Emerald's Senior Vice President for Development and Compliance.[8] Kevin D.

---

[5] As alleged below (¶¶ 61-63), Donald Flynn illicitly sold shares of Emerald pursuant to a secret deal with then Rosemont Mayor Donald Stephens. He also gave intentionally false testimony in IGB proceedings.

[6] As alleged below (¶¶  25 and 31), Kevin Flynn repeatedly lied to the IGB – including about the nature and extent of his involvement with Emerald, his plotting with then Rosemont Mayor Don Stephens to relocate Emerald's operations to Rosemont, and secret agreements made by him to share interests in Emerald with entities controlled by Marvin Davis and Richard Duchossois.

[7] As alleged below (¶¶ 28-19), McMahon was responsible for managing Emerald's construction activities, which he illegally concealed from the IGB. McMahon also intentionally misled the IGB with respect to design and construction costs incurred by Emerald.

[8] As alleged below (¶ 22), McQuaid spoke with each of the plaintiffs before they entrusted money to Emerald.  During those conversations, he fraudulently induced them to commit funds to Emerald by intentionally misleading them to believe that their moneys would be returned if the IGB failed to approve either Emerald's operating license or their individual applications to become shareholders. As further alleged below (¶ 27), McQuaid also signed and submitted a fraudulent license renewal application to the IGB on behalf of Emerald.

Larson ("Larson") was Emerald's President and Chief Operating Officer.[9] Walter P. Hanley

("Hanley") was Emerald's Senior Vice President, General Counsel and Secretary.[10]

      11.     On information and belief, Donald Flynn's primary place of residence is in Cook

County, Illinois and McMahon, McQuaid, Larson and Hanley reside in Illinois. Kevin Flynn

resides in Cook County, Illinois.

## C.    The Secret Investor Defendants

      12.     Defendants Parkway Bank & Trust Co., Rocco Suspenzi, Jeffrey Suspenzi, The

Suspenzi Family Corporation, Nick Boscarino, Sherri Boscarino, The Sherri Boscarino Trust, Ida

Hanson, Joseph Salomone and Vito Salomone are referred to in this complaint as "the Secret

Investor Defendants." All are persons or entities who had political or other ties to the late

Donald Stephens, the long-time mayor of Rosemont, Illinois. In substantial part because of their

hidden ownership interests in Emerald (only Joseph Salamone's interest was disclosed), and the

apparent ties of some of them to organized crime, which has traditionally sought to infiltrate

casino projects like Emerald's, the Illinois Gaming Board ("IGB") revoked Emerald's gaming

license, resulting in plaintiffs' losses. In the IGB proceedings that led to the revocation of

Emerald's license, each of the individual Secret Investor Defendants invoked the Fifth

Amendment and refused to respond to questions about their interests in Emerald. Their

---

[9] Larson verified a false Answer to the IGB's Disciplinary Complaint against Emerald, including statements in that Answer falsely denying that Kevin Flynn had made secret agreements to share interests in Emerald with entities controlled by Marvin Davis and Richard Duchossois.

[10] As alleged below (¶ 25), Hanley met with the IGB on August 10, 1999 and during that meeting, along with defendant McQuaid, he purposefully and dishonestly misrepresented the status of Emerald's construction activities in Rosemont. Hanley also disobeyed IGB orders to produce documents.

invocation of the Fifth Amendment permits adverse inferences to be drawn against them. *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 (1997).

13.    Parkway Bank & Trust Co. ("Parkway Bank") is an Illinois bank based in Harwood Heights, Illinois. Parkway Bank is controlled by defendants Rocco and Jeffrey Suspenzi, and it funded defendant Nick Boscarino's secret acquisition of an ownership interest in Emerald. Parkway Bank principals, Rocco Suspenzi and Jeffrey Suspenzi, and the Suspenzi Family Corporation also secretly shared in an ownership interest in Emerald with Vito Salamone who, according to FBI memoranda, had connections to organized crime. These secret investment interests were concealed by defendants from the IGB and from the plaintiffs.

14.    Rocco Suspenzi is Chairman of Parkway Bank. On information and belief, he resides in Cook County, Illinois.

15.    The Suspenzi Family Corporation is, on information and belief, a financial or business entity owned or controlled by Rocco and Jeffrey Suspenzi.

16.    Jeffrey Suspenzi is the son of Rocco Suspenzi and was an Assistant Vice President of Parkway Bank. In October 2006, Jeffrey Suspenzi pleaded guilty to federal charges of bank fraud and tax evasion with regard to his fraudulent misappropriation of funds from a Parkway Bank customer.

17.    Nick Boscarino is the husband of Sherri Boscarino and son of defendant Ida Hansen and, according to FBI memoranda, connected to organized crime. Nick Boscsarino controlled the Sherri Boscarino Trust, which purchased a 1% ownership interest in Emerald, using Sherri Boscarino and Ida Hansen as fronts. Sherri Boscarino is the purported maker of the Sherri Boscarino Trust. Ida Hansen is the apparent Trustee of the Sherri Boscarino Trust. The

Sherri Boscarino Trust was a vehicle to disguise Nick Boscarino's ownership interest in Emerald. On February 17, 2005, Nick Boscarino was convicted of defrauding the Village of Rosemont and is now incarcerated in a federal penitentiary. Prior to his incarceration he was, on information and belief, a resident of Cook County, Illinois. On information and belief Sherri Boscarino resides in Cook County, Illinois.

18.     Joseph Salamone was an investment partner in Emerald with his brother, Vito Salamone and Rocco and Jeffrey Suspenzi, an arrangement that was concealed from the IGB and from plaintiffs. According to FBI memoranda, Vito Salamone has connections to organized crime.

## III.  FACTUAL ALLEGATIONS

19.     Emerald Casino, Inc. has been the holder of an Illinois Riverboat Gambling license, issued by the Illinois Gaming Board, since 1992.[11] Due, however, to disputes and litigation with both the Illinois Attorney General and the IGB, Emerald has been unable to conduct gaming operations since 1997.[12]

## A.     Casino Legislation in 1999 Revived Emerald's Prospects

20.     During the summer of 1999, the longstanding disputes between Emerald and the IGB appeared to be resolved by the Illinois General Assembly's passage of a bill authorizing Emerald both to re-apply for license renewal and to relocate its operations to Rosemont, Illinois.

---

[11] The license was originally issued in 1992 to a joint venture in which Emerald (then known as "HP") owned a 50 percent stake.

[12] In spite of this inability to operate, Emerald has remained obligated to comply with IGB rules and Illinois riverboat gaming laws. 86 Ill. Adm. Code §§ 3000.140(a, b and c); 3000.235(a).

9

This legislation also provided that the IGB "*shall* grant the [license] application and approval."

230 ILCS 10/11.2(a) (emphasis added). In the wake of the passage of that legislation, the IGB

mooted all pending revocation proceedings against Emerald. It appeared certain that Emerald

was back on the road to operations.

21.    In addition to paving the way for renewal of Emerald's license and relocation of

the casino, the new legislation also imposed a requirement that Emerald "attain a level of at least

20% minority and female ownership." 230 ILCS 10/11.2(b). To satisfy that requirement, in

August and September of 1999, Emerald offered subscription and "shareholder" agreements to a

group of women and minority investors, including each of the plaintiffs in this case.

### B.    The Insider Defendants Misrepresented and Concealed Material Facts from Plaintiffs in Order to Induce Them to Invest.

22.    Before entrusting their funds to Emerald, each of the plaintiffs met or discussed

the investment with defendant McQuaid and, in some instances, also defendant Kevin Flynn. In

the course of these discussions and/or meetings, and in all written materials provided, McQuaid,

and Kevin Flynn when present, acting pursuant to an agreement or understanding with the other

Insider Defendants, fraudulently induced plaintiffs to subscribe for shares and commit funds to

Emerald by misrepresenting and/or fraudulently concealing material facts, conduct and events.

23.    Before entrusting funds to Emerald, plaintiff Albert Johnson specifically asked

defendant McQuaid about the financial condition of Emerald, including about past debts of

approximately $30 million owed by the corporation. McQuaid falsely assured Johnson that the

debts had been or would be resolved without use of the funds provided by plaintiffs, represented

that any financial problems of Emerald were in the past and discouraged Johnson from

concerning himself with Emerald's financial condition. Johnson shared these false

encouragements with other plaintiffs.

24.    Before investing, plaintiff Ernest Ojeda specifically asked defendant McQuaid

what would happen if the IGB denied Emerald's application for a license or if the casino were

not built. McQuaid falsely assured Ojeda that his money would be returned if that occurred and

that there would be no risk to Ojeda's investment unless and until Emerald's license was renewed

and the casino was built.

25.    Each of the plaintiffs was defrauded by the Insider Defendants' intentional

concealment and/or participation in a conspiracy to conceal the following additional facts,

conduct and events:

> (a)    Emerald had no safeguards in place to prevent ineligible interests from
> investing in its casino, despite abundant cause to put such safeguards in place,
> including the overall history of mob infiltration in gaming concerns.

> (b)    The Insider Defendants had agreed to reserve a 5% ownership interest in
> Emerald for then Rosemont Mayor Donald Stephens for distribution to "local
> investors" – a euphemism for persons to be selected by Stephens, who turned out
> to include persons associated with organized crime. This set aside for Stephens
> was not disclosed to the IGB.

> (c)    Defendant Kevin Flynn, and on information and belief the other Insider
> Defendants, had also secretly agreed both to sell a 37.5% ownership interest in
> Emerald to billionaire oil-tycoon and entertainment mogul Marvin Davis and to
> give entities associated with Richard Duchossois, owner of Arlington Park
> racetrack, an option to purchase a 20% ownership interest. Contrary to IGB
> regulations, which required prior disclosure and approval of these agreements,
> Kevin Flynn insisted that both Davis and Duchossois keep these agreements
> confidential.[13]

---

[13] In part because it violated IGB regulations, as an undisclosed, unapproved transfer of interest,
the agreement to transfer interests to the Davis Companies was subsequently judicially declared
unenforceable. *Davis Co., Inc. v. Emerald Casino, Inc.*, 2003 WL 22113414 (N.D. Ill. Sept. 11,
2003).

(d)    Upon passage of the 1999 legislation mandating 20% minority and female ownership of Emerald, Kevin Flynn reneged on the agreements with the Davis Companies and Duchossois, as a result of which The Davis Companies threatened suit for specific performance. Unknown to plaintiffs, ownership interests being offered to them were thus subject to competing claims by Davis and Duchossois.

(e)    Prior to receiving plaintiffs' funds and despite the already-issued threat of litigation by the Davis Companies, Emerald's board of directors authorized Emerald's officers to incur major financial commitments for construction costs, payable from funds contributed by plaintiffs. Contrary, however, to IGB regulations, neither these financial commitments and changes in capitalization, nor the use of plaintiffs' funds as a source of debt financing and for construction, nor the construction plans and contracts themselves, had ever been revealed to or approved by the IGB.

(f)    Although plaintiffs were contributing funds toward purchase of a 20% ownership interest, Emerald had little or no remaining paid-in-capital reflecting the other 80% ownership interests.

(g)    Emerald did not have, and did not intend to maintain, reserve funds with which to refund plaintiffs' funds in the event that IGB licensing was not received or the IGB failed to approve ownership interests for plaintiffs.

(h)    Emerald was actively and fraudulently concealing construction activities from the IGB. On August 6, 1999, defendant McMahon met with various construction consultants and contractors and told them that activity at the site needed to be kept discrete in order not to trigger IGB action.

(i)    On August 10, 1999, defendants Hanley and McQuaid met with the IGB and intentionally misled the IGB about the status of agreements and developments with respect to construction at the Emerald site in Rosemont.

(j)    Defendant Donald Flynn, without knowledge or approval of the IGB, had sold Emerald shares to three persons who were ineligible to own shares because they were public officials or the relatives of public officials.

26.    Both the existence and the concealment of the facts, events and conduct recited in paragraph 25 above were motivating factors in the IGB's decision to revoke Emerald's license in December 2005 and in the affirmance of that decision by the Illinois Appellate Court. These

12

acts, event and conduct, which were likewise concealed from plaintiffs, would have been

material to each plaintiff and would have caused every plaintiff not to entrust money to Emerald.

**C.    The Insider Defendants Filed a Fraudulent Application for License Renewal with the IGB.**

27.    On September 24, 1999, defendant McQuaid signed and submitted an application

to the IGB to renew Emerald's license. Each of the Insider Defendants knew that that

application contained fraudulent misrepresentations and omissions or, at a minimum, permitted

the application to be filed with reckless disregard for the truth or falsity of statements in it. The

application was fraudulent in the following respects:

(a)    It falsely represented that none of the shareholders of Emerald were public officials or relatives of public officials.

(b)    The application form required that Emerald submit "all agreements, arrangements, and commitments related to proposed gaming facility and related project." The Insider Defendants submitted five agreements, none of which were pertinent to this inquiry, and the application falsely stated that Emerald had not executed any others. In fact, Emerald had executed secret letters of intent, a site access agreement and extension agreements with the Village of Rosemont (which purported to obligate both Emerald and Rosemont not to disclose their terms); entered into secret agreements for the transfer of shares with the Davis and Duchossois interests; made various other undisclosed agreements and proposals from architectural, design and construction contractors; and authorized payments to several subcontractors.

(c)    The application form required disclosure of any threatened litigation. The Insider Defendants concealed information about the litigation threatened by the Davis companies, even though the Davis companies had already notified Emerald of their intent to file suit (which was in fact filed just weeks later).

D.    **The Insider Defendants Engaged in a Concerted Scheme to Violate IGB Procedures, Rules and Regulations and to Flat-Out Lie to the IGB.**

28.    The Insider Defendants, and particularly defendants Hanley, McQuaid and

McMahon, repeatedly and actively misled the IGB with respect to material matters, including:

   (a)    The existence, scope and progress of construction and development activities;

   (b)    The receipt and expenditure of funds, including plaintiffs' funds, without approval by the IGB.

29.    The Insider Defendants also authorized and/or ratified execution of a Lease and

Development agreement between Emerald and Rosemont, which contained provisions violative

of IGB rules and procedures in that:

   (a)    The Agreement allowed the Village of Rosemont to waive the requirement that Emerald obtain necessary IGB approval before commencing construction;

   (b)    The Agreement committed Emerald to fund construction of a parking garage addition even though Emerald did not have sufficient financing to do so;

   (c)    The Agreement failed to provide Emerald with the ability to exercise appropriate control or supervision over the management of contractors and sub-contractors for the casino and parking garage project; and

30.    The Insider Defendants used the proceeds they collected from plaintiffs even

though neither receipt nor expenditure of those proceeds had been approved by the IGB. The

Insider Defendants never told plaintiffs that their money would be spent on construction before

licensing had been obtained or IGB approval for construction had been granted. The Insider

Defendants in fact spent millions of dollars of plaintiffs' money on construction notwithstanding

that the IGB had repeatedly advised them that securing and obtaining IGB approval for financing

was a required predicate for construction.

14

31.    Both in sworn statements and in letters to the IGB, Kevin Flynn repeatedly misrepresented that he had not become involved in the activities or management of Emerald until June of 1999. Kevin Flynn also lied about a 1997 meeting with Mayor Stephens.

### E.    The IGB Revokes Emerald's Gaming License.

32.    The above alleged misconduct was more than enough basis to justify the IGB's revocation of Emerald's license. However, that outcome could have been avoided if the Insider Defendants had properly responded to IGB inquiries and cooperated with the IGB, mindful of the IGB's regulatory authority over gaming in Illinois. They intentionally failed to do so.

33.    On February 22, 2000, due to the conduct alleged above, the IGB passed a resolution demanding that Emerald provide "a written memorandum explaining (a) the reasons the company has failed to comply with the requirements set forth under the Riverboat Gambling Act and Board Rules; and (b) the reasons the company should not be required to immediately cease and desist the construction in Rosemont." In response, the Insider Defendants provided inadequate explanations and therefore, on January 30, 2001, the IGB announced its intent to deny Emerald's application for renewal and to revoke Emerald's owner's license.

34.    On March 6, 2001, the IGB issued its written notice of denial and filed a five-count Complaint for Disciplinary Action against Emerald seeking revocation of Emerald's license. The Complaint alleged that, among other things, Emerald had engaged in stock sales and otherwise taken action that would tend to discredit the State of Illinois and gaming in the State of Illinois.[14]

---

[14]On at least two occasions subsequent to the IGB's written notice of denial and the commencement of disciplinary proceedings against Emerald, agreements were struck under which the Insider Defendants would have sold their interests in Emerald and plaintiffs would

35.    Revocation proceedings were commenced and culminated in a detailed set of

written findings of fact, issued in November 2005 by Judge Abner Mikva, who, serving as an

IGB hearing officer, recommended that the Board revoke Emerald's owner's license and deny

any efforts by Emerald to engage in gambling in Illinois at any location.

36.    On December 20, 2005, the Board issued a final administrative order in which it

concurred with and adopted ALJ Mikva's disciplinary recommendation. The IGB revoked

Emerald's owner's license.

37.    Emerald filed a petition for review of the Board's revocation order with

the Illinois Appellate Court.

**F.    The Illinois Appellate Court Affirms the IGB's Order Revoking Emerald's License.**

38.    On May 30, 2007, the Illinois Appellate Court affirmed the IGB's final order

revoking Emerald's license. *Emerald Casino, Inc. v. IGB*, No. 4-06-0051 (4th Dist. May 30,

2007). The Appellate Court's decision states, in part, that, the "proved violations of the Board's

rules are plentiful. Each one of these violations, standing alone, could support a revocation of

Emerald's license." Slip Op. at 107.

---

have recouped their investments. In July of 2001, an Agreement and Plan of Merger was
reached with MGM Mirage ("MGM") for a purchase price in excess of $615,000,000. After the
IGB rejected that deal, reportedly because the Insider Defendants had negotiated for too
generous a payout to themselves, subsequent auction arrangements were made under which the
Insider Defendants would have sold their interests to another buyer, the Isle of Capris, in a
transaction that likewise would have permitted plaintiffs to recover their investments. The IGB
also rejected that deal -- and thereafter resumed prosecution of revocation proceedings against
Emerald.

## COUNT I

### **Breach of Contract**
*(Against all defendants)*

39.    Plaintiffs re-allege paragraphs 1 - 38, above.

40.    Each of the plaintiffs and each of the defendants was party to, or subject to, a

common shareholder agreement (a sample of which is attached as Exhibit B hereto), which

imposes obligations between and among them.

41.    Paragraph 10 of that common agreement states as follows:

> Additional Agreements of Shareholders.  Each Shareholder shall
> cooperate with the Corporation to provide any disclosure
> information to the IGB and take any actions necessary to secure
> the renewal of the Corporation's gaming license.  Each
> Shareholder further agrees to comply with the [Riverboat
> Gambling] Act and all rules and orders of the IGB and shall not
> commit any acts which would jeopardize the license or a renewal
> thereof.

42.    Plaintiffs performed their obligations under the shareholder agreement.

43.    By their conduct alleged above, each of the defendants breached paragraph 10 of

the shareholder agreement, including paragraphs 4.06 and 10 and causing, as a result, the loss of

the entirety of the funds plaintiffs entrusted to Emerald and damages incidental thereto.


## COUNT II

### **Fraud**
*(Against defendants McQuaid and Kevin Flynn)*

44.    Plaintiffs re-allege paragraphs 1 - 38, above.

17

45.     By their conduct described above, and as part of a scheme to defraud plaintiffs,

defendants McQuaid and Kevin Flynn knowingly or recklessly made, participated in making

and/or ratified false and fraudulent statements of material facts to each plaintiff, upon which they

knew or reasonably should have known that plaintiffs would justifiably rely. McQuaid and Kevin

Flynn also misleadingly failed to disclose and actively concealed material facts, basic to their

transactions with each plaintiff, knowing that the truth was not known or accessible to plaintiffs

and that plaintiffs would justifiably expect disclosure of those concealed facts.

46.     As a result of the fraudulent acts of these defendants and plaintiffs' reliance on

them, plaintiffs have suffered and continue to suffer actual damages.


## COUNT III

### Breach of Fiduciary Duties
*(Against the Insider Defendants)*

47.     Plaintiffs re-allege paragraphs 1 - 38, above.

48.     The Insider Defendants undertook fiduciary obligations with regard to all funds

entrusted to them by plaintiffs by receiving, taking and holding them; by virtue of their control of

Emerald and exclusive knowledge about Emerald's affairs; by virtue of Emerald's being a

closely-held corporation not subject to SEC public-filing requirements and for which,

accordingly, no ready source or market for information exists; and through their conduct as

promoters of Emerald shares. These duties include but were not limited to the duty to protect the

money for the benefit of the plaintiffs; the duty to use the money for the benefit of the plaintiffs;

a duty of candor with respect to when and for what purposes the money would be spent; a duty to

provide a complete, timely and detailed accounting to plaintiffs of the uses and disposition of all

18

funds received; and the duty to otherwise exercise fiduciary fairness in all dealings with plaintiffs.

49. As a result of the Insider Defendants' breaches of these fiduciary duties owed to plaintiffs, plaintiffs have been injured.

## COUNT IV
### Illinois Consumer Fraud Act
*(Against the Insider Defendants)*

50. Plaintiffs re-allege paragraphs 1 - 38, above.

51. The Insider Defendants by their conduct have employed unfair and deceptive acts and practices, including deception, fraud, misrepresentation, concealment, and suppression and omission of material facts in the conduct of trade and commerce, with the intent that plaintiffs would rely on such conduct, and in violation of the Illinois Consumer Fraud Act. 815 ILCS 505/1.

52. As a proximate result of this conduct, plaintiffs have suffered and continue to suffer actual damages.

## COUNT V
### Equitable Estoppel
*(Against all defendants)*

53. Plaintiffs re-allege paragraphs 1 - 38, above.

54. By their conduct alleged above, defendants assisted or participated in conduct upon which defendants expected plaintiffs to rely and upon which plaintiffs did justifiably rely, suffering losses as a result, under circumstances where the duty of honest dealing and equitable principles should deny defendants the right to repudiate the consequences of their conduct.

19

**COUNT VI**
**Constructive Fraud**
*(Against the Insider Defendants)*

55.    Plaintiffs re-allege paragraphs 1 - 38, above.

56.    In breach of their duties to plaintiffs, the Insider Defendants made, participated in making or ratified false statements of material facts or misleadingly failed to disclose material facts, knowing and believing that such misrepresentations or omissions were false and misleading, or with reckless disregard for accuracy, and their conduct has carried with it all of the injurious consequences that would normally flow from an intentional design to perpetrate an actual fraud.

57.    The Insider Defendants are liable for their conduct under the doctrine of constructive fraud, just as if their malicious intent had been established as a matter of law.

58.    As a result of the Insider Defendants' constructive fraud, plaintiffs have suffered and continue to suffer losses.

**COUNT VII**
**Conspiracy**
*(Against all defendants)*

59.    Plaintiffs re-allege paragraphs 1 - 38, above.

60.    Each of the defendants agreed or reached an understanding to participate in a scheme to defraud the IGB and plaintiffs. Each of the defendants understood the general objectives of the conspiratorial scheme, accepted them and agreed, explicitly or implicitly, to do his, her or its part to further those objectives, by accomplishing unlawful purposes by lawful means and/or lawful purposes by unlawful means.

20

61.     At the time of plaintiffs' investment, the defendants concealed from plaintiffs that secret deals that would not be disclosed to the IGB had been cut to transfer Emerald shares, including that an agreement had been made to reserve 5% of Emerald's shares for then Rosemont Mayor Stephens, who had already met with Kevin Flynn two or three times to discuss relocating the Emerald casino to Rosemont and with members of organized crime for a discussion concerning mob infiltration and control of the operations of, and various construction contracts for, a Rosemont casino.

62.     Between September 1, 1999 and September 17, 1999, Donald Flynn executed agreements to transfer almost 5% of Emerald's shares to outside investors. Nick Boscarino and Vito Salamone both obtained interests in Emerald as a result of the 5% interest promised by the Insider Defendants to Stephens. Through agreements and transactions with Nick Boscarino and/or Vito Salamone, defendants Sherry Boscarino, The Sherri Boscarino Trust, Ida Hansen, and Jeffrey and Rocco Suspenzi also obtained interests in Emerald Casino.

63.     Pursuant to a memorandum agreement executed in September 1999, and withheld from the IGB and plaintiffs but obtained by the FBI, the shares Donald Flynn transferred to the Salamones were, in turn, divided among the Salamones, defendant Rocco Suspenzi, defendant Jeffrey Suspenzi, and defendant Suspenzi Family Corporation.

64.     On August 30, 1999, Parkway Bank, of which defendant Rocco Suspenzi is the Chairman and Chief Executive Officer, prepared a cashier's check payable to Nick Boscarino in the amount of $1,500,000, purportedly as a loan. The same day, August 30, 1999, Nick Boscarino endorsed that $1,500,000 cashier's check and deposited it into the account of the just-created defendant Sherri Boscarino Trust. Also on August 30, 1999, a Parkway Bank counter

21

check payable in the amount of $1,500,000 to Emerald Casino, Inc. was written by defendant Ida

L. Hansen on the Sherri Boscarino Trust Account to purchase 1% of the outstanding shares of

Emerald's capital stock. Also on August 30, 1999, Ida Hansen signed a promissory note payable

to Nick Boscarino for $1,500,000, which was not provided to the IGB at any time during its

investigation of Emerald's license renewal application.

65.    During IGB proceedings, when questioned about their dealings with Emerald and

Mayor Stephens, Nick and Sherry Boscarino, Ida Hansen, Vito and Joseph Salamone and Jeffrey

and Rocco Suspenzi each invoked the Fifth Amendment and refused to answer.

66.    As a proximate result of agreements or understandings reached by and among

each of the defendants to defraud the IGB and plaintiffs, plaintiffs have suffered and continue to

suffer actual damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court award them: (a) full compensatory

damages, including both out-of-pocket losses and lost future profits, with interest as provided by

law; (b) costs of suit, including a reasonable attorney's fee, (c) punitive damages, (d) a full

accounting of how plaintiffs' funds were spent, and (e) such other relief as the Court may deem

just and proper.

**Jury Demand**

Plaintiffs demand trial by jury on all claims triable to a jury.

Dated: October 22, 2007

Respectfully submitted,

_____
One of the Attorneys for Plaintiffs

*Attorneys for all plaintiffs*
*except Elizabeth Lucas*
Matthew J. Piers
Joshua Karsh
Cara Hendrickson
HUGHES SOCOL
PIERS RESNICK & DYM, LTD.
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
312.580.0100
**Firm ID # 32662**

*Attorney for Elizabeth Lucas*
Royal B. Martin
Martin, Brown & Sullivan
321 South Plymouth Court, 10th Floor
Chicago, Illinois 60604
312.360.5000
**Firm ID # 29313**

00123995.DOC

23

EXHIBIT A

# EMERALD CASINO, INC.
## SUBSCRIPTION AGREEMENT

Emerald Casino, Inc.
c/o Joseph McQuaid
120 North LaSalle Street
Suite 3300
Chicago, Illinois  60602

## I.  SUBSCRIPTION

The undersigned hereby subscribes for and agrees to purchase from Emerald Casino, Inc., an Illinois corporation (the "Issuer") the number of shares of common stock (the "Shares"), which will represent ¼ percent (25%) of the outstanding capital stock of the Issuer as of the Acceptance Date, at a price based upon One Million Five Hundred Thousand Dollars ($1,500,000.00) per one percent (1%) of the Issuer's Shares. The total purchase price for the Shares subscribed for by the undersigned is $ 375,000 ⁰⁰ (the "Purchase Price"). The Shares are more fully described in Section II below.

The Purchase Price shall be payable in full in cash upon execution of this Subscription Agreement. Upon acceptance of this Subscription Agreement by the Issuer, the funds tendered by the undersigned shall be available to the Issuer for its unrestricted use and general corporate purposes. In the event that the Illinois Gaming Board (the "IGB") determines that the undersigned is an acceptable owner of the Company, the Issuer shall credit the Purchase Price as payment toward the Shares and promptly issue the Shares to the undersigned. In the event that the IGB determines that the undersigned is not an acceptable owner of the Issuer, (a) this Agreement shall immediately terminate without any further action required of the parties, (b) the Issuer shall not issue the Shares, and (c) the Issuer shall have no liability or obligations to the undersigned, except the Issuer shall return the Purchase Price without interest to the undersigned within ninety days after such determination by the IGB.

The undersigned hereby submits concurrently: (a) this Subscription Agreement, (b) the Prospective Purchaser Questionnaire, (c) an executed Shareholders' Agreement in the form previously delivered to the undersigned, and (d) IGB Personal Disclosure Form 1 (collectively, (a), (b), (c) and (d) are referred to herein as the "Documents"), and (e) the Purchase Price. The Company will submit to the IGB the Personal Disclosure Form 1 for a background investigation of the undersigned. The undersigned will pay all expenses relating to such background investigation.



EXHIBIT
A

ALRITTER  239764F v3  August 2, 1999

## II.  DESCRIPTION OF SHARES

Upon payment by the undersigned of the Purchase Price and written approval of the undersigned by the IGB, the Shares shall be issued to the undersigned and shall consist of fully paid, non-assessable, no par value common stock of the Corporation.  The actual number of Shares to be issued to the undersigned will be finally determined based upon the total subscriptions received and accepted by the Issuer for the Shares offered hereunder, but will represent the percentage interest in the Issuer subscribed for by the undersigned.  The Shares will not be registered under the Securities Act of 1933, as amended  (the "Act") and cannot be sold or transferred unless (a) an exemption from any registration requirements under the Act is applicable to the sale or transfer, and (b) they are sold or transferred to a female as defined in section 2 of the Business Enterprise for Minorities, Females and Persons with Disabilities Act.

## III.  ACCREDITATION AND/OR QUALIFICATIONS

The undersigned understands that the Shares  are not to be registered under the Act and are being offered and sold in reliance upon exemptions from registration under the Act.  The undersigned hereby warrants and represents that either (a) he is an "Accredited Investor", as that term is defined in Section 2(15)(ii) of the Act and Rule 501(a) promulgated thereunder or (b) he has business experience and sophistication and financial net worth sufficient to be qualified to invest in the Shares.

## IV.  REPRESENTATIONS AND WARRANTIES

The undersigned makes the following additional agreements, representations, declarations, acknowledgments, and warranties with the intent that the same may be relied upon in determining his suitability as a purchaser of Shares and for admission as a Shareholder of the Issuer:

(1)     The undersigned is a bona-fide resident of the State set forth in his address below, and agrees that, in the event his principal residence is changed prior to purchase of the Shares, he will promptly notify the Issuer, and if the change is to a State in which offers and/or sales of Shares in the manner contemplated are prohibited by applicable law, that any offer to sell the Shares to him prior to notification of the change shall be deemed retracted and he shall no longer be entitled to purchase Shares pursuant to such offer.

(2)     The undersigned has read, understands, and is fully familiar with the Documents and understands and is fully familiar with any and all other aspects of the transactions contemplated herein not specifically contained in the Documents.

ALRITTER  239764F  v3  August 2, 1999                     -2-

(3)    The Shares subscribed for herein will be acquired solely by and for the account of the undersigned, for investment, and are not being purchased for subdivision, fractionalization, resale or distribution; the undersigned has no contract, undertaking, agreement, or arrangement with any person to sell, transfer, or pledge to such person or anyone else all or any part of the Shares for which the undersigned hereby subscribes; and the undersigned has no present plans or intentions to enter into any such contract, undertaking or arrangement.

(4)    The undersigned agrees that he will not dispose of the Shares, or any interest therein, unless and until the Issuer shall have determined, by obtaining an opinion of counsel for the undersigned in a form satisfactory to the Issuer, that the intended disposition is permissible under the Articles of Incorporation and By-Laws of the Issuer and the Shareholders' Agreement (the "Corporate Documents") and will not violate the Act or any applicable state securities law or the rules and regulations of the Securities and Exchange Commission or any state securities commission promulgated under such statutes.

(5)    The Shares have not and will not be registered under the Act and cannot be sold or transferred without compliance with the registration provisions of the Act or compliance with exemptions, if any, available thereunder. The undersigned understands that the Issuer has no obligation or intention to register the Shares under any federal or state securities act or law, or to file the reports to make public the information required under the Act.

(6)    The undersigned expressly represents that: (a) his financial condition is such that he has no need for liquidity with respect to his investment in the Shares to satisfy any existing or contemplated undertaking or indebtedness and (b) he is not seeking a current cash return with respect to his investment in the Shares and has no need for a current return on his investment in the Issuer.

(7)    The undersigned acknowledges that the Issuer has made all documents and information pertaining to the transaction described in the Documents and the business of the Issuer or otherwise available to the undersigned and has allowed the undersigned an opportunity to ask questions and receive answers thereto and to verify and clarify the information made available.

(8)    The undersigned has relied solely upon the Documents and independent investigations made by the undersigned in making the decision to purchase the Shares subscribed for herein, and acknowledges that no representations or agreements, other than those set forth in the documents referred to therein, the Documents and the Corporate Documents, have been made to the undersigned with respect thereto.

(9)    The undersigned expressly acknowledges that (a) the Shares are speculative investments that involve a high degree of risk of loss of the entire investment of the undersigned in the Issuer; (b) no federal or state agency has passed upon the adequacy or accuracy of the information set forth in the Documents, or made any finding or determination as to the Shares as an investment; (c) the recently enacted legislation which authorized the Issuer to relocate its gambling operations is subject to potential legal action or future legislative changes that could result in the loss of the entire investment of the undersigned in the Issuer; and (d) any anticipated Federal and/or state income tax benefits applicable to the Shares may be lost through changes in, or adverse interpretations of, existing laws and regulations.

(10)    The undersigned expressly acknowledges that: (a) there are restrictions on the transferability of the Shares, there will be no public market for the Shares, and, accordingly, it may not be possible for the undersigned to liquidate his investment in the Shares; (b) the certificate(s) of stock for the Shares shall have the following restrictive legends:

> The sale, transfer or encumbrance of this certificate is subject to the Shareholders' Agreement dated as of *August 18*, 1999 (the "Shareholders' Agreement"). A copy of the Shareholders' Agreement is on file in the office of the Secretary of the Corporation. The Shareholders' Agreement provides, among other things, for certain obligations to sell the shares evidenced by this certificate for a designated purchase price. By accepting the shares of the stock evidenced by this certificate, the holder agrees to execute and be bound by the Shareholders' Agreement.

> The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or any state Securities Act. The holder may not sell or transfer these shares unless they are registered pursuant to these laws or unless exemptions from the registration requirements of these laws are applicable to the sale or transfer.

> The shares evidenced by this certificate may only be transferred to a female as defined in Section 2 of the Business Enterprise for Minorities, Females or Persons with Disabilities Act.

and (c) stop transfer instructions shall be noted in the appropriate records of the Issuer.

(11)    All information that the undersigned has provided concerning himself and his financial position is true and correct and complete as of the date set forth below,

ALRITTER 239764F v3 August 2, 1999                     -4-

and if there should be any material change in such information prior to the acceptance of his subscription for the Shares that he is purchasing, he will immediately provide such information to the Issuer.

(12)    The undersigned is an individual who will qualify as an eligible shareholder of a Subchapter S Corporation under Section 1361 of the Internal Revenue Code of 1986, as amended.

## V. QUALIFICATION UNDER ILLINOIS RIVERBOAT GAMBLING ACT

The undersigned represents and warrants that the undersigned is a female as defined in Section 2 of the Business Enterprise for Minorities, Females and Persons with Disabilities Act.

## VI. INDEMNIFICATION/COVENANT NOT TO SUE

The undersigned hereby agrees to indemnify the Issuer, the shareholders, officers and board of directors of the Issuer and their affiliates, agents and employees, and hold each of them harmless against any and all loss, damage, liability or expense including reasonable attorneys' fees, which they or any of them may suffer, sustain or incur by reason of or in connection with any misrepresentation or breach of warranty or agreement made by the undersigned in the Documents, or in connection with the sale or distribution by the undersigned of the Shares purchased by the undersigned pursuant hereto in violation of the Act, the Documents, or any other applicable agreement or law.

For good and valuable consideration received, the undersigned does hereby acknowledge that the undersigned is aware that the business to be conducted by Issuer will be of a risky and speculative nature; that the undersigned's investment in the Issuer involves a high degree of risk of loss of the undersigned's entire investment in the Issuer; and that the undersigned may be the holder of a prospective claim against the Issuer, arising from financial losses or other damages caused by purchases of Shares by the undersigned. The undersigned hereby covenants that the undersigned shall not commence or maintain any suit thereon against the Issuer, its shareholders, officers or directors, whether at law or in equity, except under circumstances involving gross negligence or willful misconduct.

## VII. ACCEPTANCE AND REVOCATION

The undersigned understands and agrees that this subscription may be accepted or rejected by the Issuer, in whole or in part, in its sole and absolute discretion, and if accepted, the Shares purchased pursuant hereto will be issued only in the name of the undersigned. The undersigned hereby acknowledges and agrees that this Subscription Agreement may not be canceled, revoked, or withdrawn, and that this Subscription Agreement and the Documents submitted herewith shall survive (i) changes in the transactions that are not material, and (ii) death or disability of the

ALRITTER 239764F v3 August 2, 1999          -5-

undersigned, provided, however, that if the Issuer shall not have accepted this Subscription Agreement within ninety (90) days of receipt hereof by the Issuer, this Subscription Agreement and all documents submitted herewith shall automatically be canceled, terminated and revoked, and all funds heretofore or herewith paid shall be returned promptly to the undersigned or its successor upon request without interest.

## VIII. MISCELLANEOUS

The Issuer may use the proceeds from this Subscription Agreement for its unrestricted use and general corporate purposes immediately upon acceptance of this subscription, and shall not be required to accept any minimum investment amount prior to such use.

This Subscription Agreement and the rights and obligations hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of Illinois without giving effect to principles and provisions thereof relating to conflict or choice of laws.

This Subscription Agreement and the representations and warranties contained herein shall be binding upon the heirs, executors, administrators and other successors of the undersigned. If there is more than one signatory hereto, the obligations, representations, warranties and agreements of the undersigned are made jointly and severally.

The use of the masculine, feminine or neuter gender and the use of the singular and plural shall not be given the effect of any exclusion or limitation herein.

Executed at _Chicago_, _IL_ this _18_ day of _August_, 1999.

_[signature] Maureen M. Oberman_
Signature

Percentage Interest
subscribed hereby:                              _.25% minority_

Purchase Price :                                $ _375,000._

Subscriber's Name and         _Maureen M. Obermeier_
Principal Residence
Address (Please Print):                    Redacted
Telephone Number

Taxpayer Social Security
Number:                              Redacted

Acceptance

Accepted this 1st day of Sept, 1999 at Chicago, Illinois.

Emerald Casino, Inc., an Illinois corporation

By: _____
Its: Senior Vice President

**EXHIBIT B**

# EMERALD CASINO, INC. SHAREHOLDERS' AGREEMENT

THIS AGREEMENT is made and entered into as of the 31st day of August, 1999 between Emerald Casino, Inc., an Illinois corporation (the "Corporation") and those parties set forth on Exhibit A attached hereto while such party holds Shares (as defined below) and any party who hereafter acquires Shares (the "Shareholders").

## WITNESSETH:

WHEREAS, the initial Shareholders own the issued and outstanding shares of capital stock of the Corporation as indicated on Exhibit A hereof; and

WHEREAS, for purposes of this Agreement, "Shares" means any shares of capital stock of the Corporation now or hereafter issued; and

WHEREAS, there is not now nor is there likely in the future to be a substantial market for the Shares of the Corporation; and the parties believe that it is in the best interest of the Corporation and Shareholders to provide for the future disposition of the Shares of the Corporation, and to provide that such Shares shall be transferable only upon compliance with the terms of this Agreement; and

WHEREAS, for the foregoing reasons, the parties desire to provide (i) for the purchase of the Shares of any party desiring to sell the same by the Corporation or the remaining parties and (ii) for the purchase of the Shares of a party under certain circumstances.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Ownership of Shares. The Shares are, as of the date of this Agreement, owned by the Shareholders in the amounts shown on Exhibit A hereto.

2.    General Limitations on Transfers of Shares. Each Shareholder agrees not to transfer any Shares which he now owns or may hereafter own or control except in accordance with the terms of this Agreement. It is expressly understood and agreed that any transfer of Shares made in conflict with or in derogation of any such terms, provisions or conditions of this Agreement shall be of no legal force and effect and have no validity. The term "transfer" as used herein means any sale, gift, assignment, distribution, conveyance, pledge, hypothecation, encumbrance or other transfer of record of legal or beneficial ownership of Shares by a Shareholder, whether by operation of law or otherwise, and whether or not for value.

3.    Death of Shareholder. Upon the death of a Shareholder, if the Corporation and its counsel reasonably believe that the Corporation's status as an S Corporation may terminate due to the resulting transfer of the Shareholder's Shares,



EXHIBIT
B

1

deceased Shareholder shall take whatever steps are necessary to transfer the Shares held by such Shareholder upon his death to a trust which is a permitted shareholder as set forth in Sections 1361 (c), (d) and (e) of the Internal Revenue Code of 1986, as amended (the "Code"), or in a transaction otherwise permitted pursuant to this Agreement.

4.   Transfers to Outsiders.

4.01   Shareholder.   No Shareholder shall sell or otherwise transfer any of the Shares owned by him except as follows: A Shareholder may sell or transfer his Shares (i) to another Shareholder; (ii) to the Corporation or (iii) to a person other than a Shareholder (an "Outsider") only pursuant to the terms of this Paragraph 4.

4.02   Outside Offers.   If any Shareholder (the "Transferring Shareholder") receives a bona fide, arm's length offer from an Outsider to purchase any of the Shares owned by such Shareholder and wishes to accept such offer, the Transferring Shareholder shall sell such Shares upon the terms provided in Paragraph 4.03 through 4.07 hereof.

4.03   Notice.   If the Transferring Shareholder intends to transfer to an Outsider any Shares of which he is owner, pursuant to an offer to purchase from such Outsider, or in the event of a threatened involuntary transfer of the Shares pursuant to a judicial levy, bankruptcy, divorce decree, or otherwise (collectively, an "Outsider's Offer"), the Transferring Shareholder shall give ten (10) days written notice to the Corporation of the proposed or threatened transfer of Shares. The notice, in addition to stating the fact of the proposed transfer of Shares, shall state (a) the number of Shares to be transferred, (b) the name and address of the proposed transferee, (c) evidence reasonably satisfactory to the Corporation that the transfer will not result in a termination of the status of the Corporation as an S Corporation, as such term is defined under Section 1361 of the Code; and (d) evidence reasonably satisfactory to the Corporation that the transfer to the Outsider will be approved by the Illinois Gaming Board ("IGB") under its rules issued pursuant to the Riverboat Gambling Act of the State of Illinois, as amended, Ill. Rev. Stat. ch. 120, par. 2405, et. seq. (the "Act") and is otherwise in compliance with the Act.

4.04   Transferee Must Execute Agreement.   Any person who receives Shares is subject to all the obligations under this Agreement regardless of whether such person executes this Agreement. As a condition to any transfer of Shares, the Transferring Shareholder shall require any transferee to execute and be bound by this Agreement.

4.05   S Corporation Status. Notwithstanding anything to the contrary contained herein, no Shareholder shall be entitled to transfer his Shares under any circumstances to any person or entity if such transfer would result in a termination of the status of the Corporation as an S Corporation, as such term is defined under Section 1361 of the Code. No Shareholder shall make any transfer of Shares to any trust which is otherwise permitted by this Agreement unless (i) such trust is of the type which can be a shareholder of a S Corporation under the Code, and (ii) in connection with such transfer, arrangements are made to assure that such trust will at no time cease to be of that type which can be a shareholder of an S Corporation under the

2

Code, and the transferor provides to the board of directors of the Company (a) an opinion of counsel, or (b) a favorable ruling from the Internal Revenue Service, in each case stating that all of the requirements of this Section 4.05 have been satisfied prior to any such transfer. If any Shareholder terminates such Shareholder's entire interest in the Company in accordance with this Agreement during any taxable year of the Company, all persons who are Shareholders at any time during such taxable year shall consent to and execute an election under section 1377(a)(2) of the Code whereby the Company shall, in lieu of allocating to the Shareholders the items described in section 1366(a)(1) of the Code on an annual per share, per day basis, close its books on the date of such termination of interest and thus create two short taxable years solely for purposes of allocating such items to persons who are Shareholders at any time during such taxable year. The Shareholders recognize that it may be advisable for the Company to revoke its Subchapter S election at some time in the future for business or tax reasons. The Shareholders agree that any such decision shall be made by the board of directors of the Company. In connection with any termination of the Subchapter S election of the Company which produces an "S termination year," as that phrase is defined in section 1362(e)(4) of the Code, all persons who are Shareholders at any time during the S termination year shall consent to and execute an election under section 1362(e)(3) of the Code allocating to the Shareholders the items described in section 1366(a)(1) of the Code based upon normal tax accounting rules in lieu of the pro rata allocation described in section 1362(e)(2) of the Code.

4.06    Gaming License.    Notwithstanding anything to the contrary contained herein, no Shareholder shall be entitled to transfer his Shares under any circumstances to any person or entity, if such transfer could reasonably expect to result in the failure of the IGB to renew or a termination of the gaming license issued by the IGB to the Corporation or any other license required or desirable in connection with the operations of the Corporation.

4.07    IGB Approval.    The transfer of any Shares pursuant to this Paragraph 4 shall only be effective upon the approval of the IGB and when made in compliance with the Act. Any fees, costs or expenses incurred by the Corporation in connection with the approval of any proposed transfer shall be borne by the Transferring Shareholder.

5.    Mandatory Sale.

5.01    If the IGB determines for any reason that (a) as a result of any Shareholder being a shareholder of the Corporation, that it will not issue a gaming license to the Corporation or provide a renewal thereof, or (b) any Shareholder is not an acceptable owner of the Corporation,   the Shareholder shall promptly sell his Shares to the Corporation or another Shareholder thereof, at the Agreed Value (as defined herein).

5.02    Agreed Value.    For purposes of this Agreement, the Agreed Value shall be an amount per Share determined in an appraisal conducted by an independent valuation firm selected by the Corporation; provided, however, the IGB may (a) establish an amount per Share in lieu of such appraisal, or (b) reduce the amount per Share determined in such appraisal. The Shareholder who sells Shares for the Agreed Value shall reimburse the Corporation for all costs relating to the appraisal.

3

6. __Limitation on Obligation and Right of the Corporation to Purchase Shares.__   Notwithstanding anything contained herein, the Corporation shall not be obligated to purchase or redeem any Shares if such repurchase or redemption would (i) violate any applicable law regarding the redemption of shares by a corporation or (ii) contravene or result in an event of default under the terms of any agreement between the Corporation and any of its lenders or any other agreement to which the Corporation is a party.   In these circumstances, the Corporation will offer its shareholders the opportunity to purchase any Shares that are subject to repurchase or redemption.

7. __Pledge of Shares Prohibited.__ No Shareholder shall encumber, pledge, hypothecate or use any of his Shares as security for any loan, except upon the written consent of the Corporation and in accordance with the rules of the IGB.

8. __Legend on the Certificates.__   All Shares now or hereafter owned by the Shareholders shall be subject to the provisions of this Agreement and the certificates representing same shall bear the following legends:

The sale, transfer or encumbrance of this certificate is subject to the Shareholders' Agreement dated as of August 6, 1999 (the "Shareholders' Agreement").  A copy of the Shareholders' Agreement is on file in the office of the Secretary of the Corporation.  The Shareholders' Agreement provides, among other things, for certain obligations to sell the shares evidenced by this certificate for a designated purchase price.  By accepting the shares of the stock evidenced by this certificate, the holder agrees to execute and be bound by the Shareholders' Agreement.

The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or any state Securities Act.  The holder may not sell or transfer these shares unless they are registered pursuant to these laws or unless exemptions from the registration requirements of these laws are applicable to the sale or transfer.

9. __Election of Directors.__ During the term of this Agreement, the Shareholders agree to vote their Shares to elect Donald Flynn, Peer Pedersen and Eugene Heytow as directors of the Corporation; provided, however, no Shareholder shall be obligated under this paragraph to vote any Shares for an individual who does not own any Shares.

10. __Additional Agreements of Shareholders.__   Each Shareholder shall cooperate with the Corporation to provide any disclosure information to the IGB and take any actions necessary to secure the renewal of the Corporation's gaming license. Each Shareholder further agrees to comply with the Act and all rules and orders of the IGB and shall not commit any acts which would jeopardize the license or a renewal thereof.

11. __Termination.__  A Shareholder shall no longer be a party to this Agreement (and shall then not be subject to any obligations under this Agreement) immediately after such Shareholder validly transfers all Shares owned by such Shareholder in compliance with the terms of this Agreement.  This Agreement and all restrictions on

4

stock transfer created hereby shall terminate on the occurring of any of the following events:

    a.    The bankruptcy or dissolution of the Corporation.

    b.    A single Shareholder becoming the owner of all of the Shares of the Corporation which are then subject to this Agreement.

    c.    The execution of a written instrument by the Corporation and all of the Shareholders who then own Shares subject to this Agreement which terminates the same.

12.    <u>General Provisions.</u>

    12.01  <u>Governing Law.</u>  This Agreement shall be construed pursuant to the laws of the State of Illinois.

    12.02  <u>Remedies for Breach.</u>  The Shares are unique chattels and each party to this Agreement shall have the remedies which are available to him or it for the violation of any of the terms of this Agreement including, but not limited to, the equitable remedy of specific performance.

    12.03  <u>Notices.</u>  All notices provided for by this Agreement shall be made in writing, (1) either by actual delivery of the notice into the hands of the parties thereunto entitled; (2) by mailing of the notice in the United States mails to the last known address (which shall be the address set forth on the signature page hereof) of the party entitled thereto, registered mail, return receipt requested; or (3) by overnight carrier. The notice shall be deemed to be received in case (1) on the date of its actual receipt by the party entitled thereto and in cases (2) and (3) on the day after the date of its mailing.

    12.04  <u>Descriptive Headings.</u>  Titles to paragraphs are for information purposes only and in no way define, limit or extend or describe the scope of this Agreement or the intent of any provisions hereof.

    12.05  <u>Binding Effect.</u>  This Agreement is binding upon and inures to the benefit of the Corporation, its successors and assigns, and to the Shareholders and their respective heirs, personal representatives, successors and assigns, and the Shareholders by the signing hereof, direct their personal representatives to open their estate promptly in the courts of proper jurisdiction and to procure, execute and deliver all the documents, including, but not limited to, appropriate orders of the Circuit Court, Probate Division (or court of comparable jurisdiction) and estate and inheritance tax waivers, as shall be required to effectuate the purposes of this Agreement.

    12.06  <u>Savings Clause.</u> Any provision under applicable law or regulations which supersedes or invalidates any provision hereof shall not affect the validity of this Agreement and the remaining provisions shall be enforced as if the invalid provisions were deleted from this Agreement.

5

12.07  <u>Pronouns.</u>  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context shall require.

12.08  <u>Counterparts.</u>  This Agreement may be executed in two or more counterparts and all counterparts so executed shall for all purposes constitute one Agreement, binding on all the parties hereto, notwithstanding that all parties shall not have executed the same counterpart.

12.09  <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof.

12.10  <u>Interpretation.</u>  The use of the masculine, feminine or neuter gender and the use of the singular and plural shall not be given the effect of any exclusion or limitation herein.

12.11  <u>Prior Shareholders' Agreement.</u>  This Agreement shall become effective upon its execution by each of the parties set forth on Exhibit A attached hereto, and this Agreement shall then supersede and replace the HP, Inc. Shareholders' Agreement dated December 31, 1991.

IN WITNESS WHEREOF, the Corporation and the Shareholders have executed this Agreement as of the date first above written.

Emerald Casino, Inc., an Illinois Corporation

By:_____
                Senior Vice President

SHAREHOLDER:

Signature: _____
Print Name:     KATHRYN V. SHANNON
Address:
                        Redacted